[L.A. No. 29796. In Bank. May 5, 1971.]

BOZIDAR HRNJAK, Plaintiff and Appellant, v.
GRAYMAR, INCORPORATED et al., Defendants and Respondents.

**726**

**COUNSEL**

Milan Moacanin for Plaintiff and Appellant.

Robert E. Cartwright, Edward I. Pollock, Theodore A. Horn, Marvin E. Lewis, William H. Lally, Thomas T. Anderson, Joseph W. Cotchett and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Appellant.

Hagenbaugh, Murphy & Davies, John Davies, Spray, Gould & Bowers, John J. Costanzo and Henry F. Walker for Defendants and Respondents.

**OPINION**

**MOSK, J.**—Plaintiff appeals from a judgment rendered on a verdict in his favor in the amount of $6,100 in an action for personal injuries against defendants. We consider under what circumstances a defendant in a tort action may introduce evidence of plaintiff's receipt of collateral source

benefits for the purpose of establishing that plaintiff had a motive for feigning injury and refusing to resume gainful occupation.

On April 12, 1965, plaintiff's car was struck from behind by a brakeless General Motors truck owned by Graymar, Inc. Plaintiff, a 30-year-old carpenter, was in the process of stopping behind a line of traffic on the Santa Ana Freeway and was traveling about five miles per hour at the time of impact. Defendant Graymar's truck was proceeding at a speed of 50 miles per hour when the driver, about 120 feet away from plaintiff's automobile, applied the brakes and attempted to stop. The brakes were inoperative and the truck, slowed only by the compression of the engine, careened into the rear of plaintiff's vehicle. Plaintiff's automobile was propelled forward into a preceding car and then was struck a second time by defendant's truck. Plaintiff's 1963 Chevrolet was a total loss and the truck was severely damaged. Plaintiff was removed from the scene by ambulance.

Defendants, Graymar and General Motors Corporation, conceded their liability for the collision, and the only litigated issues involved the nature and extent of the injuries sustained by plaintiff as a proximate result of the collision and the damages to which he was entitled. These matters were sharply contested and the evidence offered by plaintiff and defendants was in irreconcilable conflict.

Plaintiff's testimony and the medical evidence produced on his behalf indicated that the impact of the collision threw him forward and to the right and caused him to lose consciousness temporarily; he suffered a severe sprain to his back in the area of the lumbar spine and a cerebral concussion; because of these injuries, he experienced considerable pain in his lower back and radiating pain in his lower abdomen as well as dizziness and nausea; his symptoms prevented him from engaging in his occupation as a carpenter and cabinetmaker during the three and a half years between the accident and the trial and necessitated his finding a new vocation which would involve less driving, lifting, bending, and standing at heights than carpentry requires; at the time of the trial, plaintiff was in the process of acquiring training as a typewriter repairman from the State Department of Rehabilitation, at which occupation his earnings would be a maximum of $125 per week compared to earnings of about $200 per week as a carpenter; he would be required to wear a sacro-lumbar back support for life, even in his new work; and his out-of-pocket medical expenses as a result of the accident amounted to more than $6,000.

Defendants presented evidence tending to prove that plaintiff was not badly shaken after the accident and had spent the 10 minutes before the ambulance arrived in directing traffic; there was never any objective mani-

festation of injury to plaintiff's back or any other part of his body as a result of the accident, and his complaints of back pain might be attributable to a previous minor automobile collision on March 17, 1965, or to an unrelated prostate infection; his complaints of pain in the lower abdomen were not attributable to his back sprain but rather were caused by a congenital kidney defect or by his prostate gland problems; and a considerable portion of the out-of-pocket medical expenses constituted payments for medical care unrelated to the accident, including expenditures to discover his kidney and prostate gland abnormalities. Defendants also attempted to cast doubt on plaintiff's earning capacity as a carpenter and emphasized his inability to produce conclusive records of his earnings during the years before the accident.

In his complaint, plaintiff sought $100,000 in damages for medical expenses, lost earnings during the three and a half years since the accident, future diminution of earnings in his new occupation, and pain and suffering. The jury awarded him damages in the amount of $6,100, and he appeals contending that the admission of collateral evidence of source receipts was prejudicial error.

On the first day of the trial, after plaintiff had concluded his testimony on direct examination and was being cross-examined by defense counsel, before any medical testimony had been produced, defendants attempted to develop that plaintiff had received payments from two collateral sources as a result of the collision with Graymar's truck. After plaintiff's objection, counsel retired to chambers where defendants offered to prove that plaintiff had received $2,000 in a lump sum under the medical payments section of his Automobile Club liability policy and $6,303 from a disability insurance policy carried with Pennsylvania Life Insurance Company. The disability benefits were paid at the rate of $200 per month for two and a half years after the accident and $600 per month prorated for the days plaintiff was actually hospitalized. Defendants assertedly offered this evidence not for the purpose of mitigating damages in the amount of the collateral benefits but to indicate plaintiff's motive in "not returning to work, the fact that he didn't have to return to work." Defendants' theory was that these collateral receipts made it financially beneficial to plaintiff to feign injury and to maintain the appearance of disability.

After argument, the trial judge ruled the evidence was admissible, relying upon the rationale he discerned in *Garfield* v. *Russell* (1967) 251 Cal.App.2d 275 [59 Cal.Rptr. 379], that evidence of a plaintiff being wholly or partially compensated for medical expenses is relevant to his motives in seeking medical help and his credibility as a witness.

On the basis of the foregoing ruling, defense counsel were allowed to question plaintiff regarding his insurance receipts, subject to the following cautionary admonition given to the jury by the court: "[T]he defendant is going to be allowed to inquire of this witness into certain insurance payments which he received during the years, 1965 to 1967. . . . [T]his evidence is relevant only to show the motive of a party in seeking medical help and his credibility as a witness. The defendants are not entitled to have any reimbursement received by the Plaintiff deducted from the total amount of damages, if any, which the jury might, otherwise, award." Also, the jury was later instructed that the insurance payments were "not to be deducted by you in arriving at the amount of damages. . . . Said payments are to be considered by you for the limited purpose of determining plaintiff's motive in seeking medical help and his credibility as a witness."

Plaintiff contends the trial court's ruling constituted an abuse of its discretion under Evidence Code section 352[1] in light of our recent rulings in *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1 [84 Cal. Rptr. 173, 465 P.2d 61] and *Acosta* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 19 [84 Cal.Rptr. 184, 465 P.2d 72]. We conclude that the contention is meritorious and necessitates reversal of the judgment and a new trial on the issue of damages.

Unlike evidence of defendant's liability insurance coverage,[2] the admissibility of evidence of plaintiff's receipt of collateral insurance benefits is not governed by specific statutory exclusion. Nevertheless, a pervasive public policy has been judicially expressed and California remains a firm proponent of the "collateral source rule."[3] ■ This doctrine provides that if an injured party received some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor.

We recently reaffirmed our adherence to the collateral source rule in two companion cases. In *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) *supra*, 2 Cal.3d 1 and *Acosta* v. *Southern Cal. Rapid Transit Dist.* (1970)

---

[1]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[2]Evidence Code section 1155 provides: "Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible to prove negligence or other wrongdoing."

[3]There are recurring but unpersuasive attacks upon the basic premises of the collateral source rule, which originated as early as 1823 in England and was first adopted in this country in 1854. (See, e.g., 10 The Judges' J. (April 1971) p. 28.)

*supra,* 2 Cal.3d 19, we left no doubt that California is firmly committed to the doctrine and validated its application in cases in which public entities were the defendants. "The collateral source rule as applied here embodies the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift. The tortfeasor should not garner the benefits of his victim's providence.

"The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. . . . To permit the defendant to tell the jury that the plaintiff has been recompensed by a collateral source for his medical costs might irretrievably upset the complex, delicate, and somewhat indefinable calculations which result in the normal jury verdict. . . .

"If we consider the collateral source rule as applied here in the context of the entire American approach to the law of torts and damages, we find that the rule presently performs a number of legitimate and even indispensable functions. . . . In this case the collateral source rule lies between two systems for the compensation of accident victims: the traditional tort recovery based on fault and the increasingly prevalent coverage based on non-fault insurance. Neither system possesses such universality of coverage or completeness of compensation that we can easily dispense with the collateral source rule's approach to meshing the two systems." (*Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) *supra,* 2 Cal.3d 1, 9-10, 11-12, 13.) (Fn. omitted.)

In the instant case, as defendants hasten to explain, testimony regarding plaintiff's receipt of collateral insurance benefits was not offered for the purpose of mitigating damages, and thus the evidence did not fall directly within the exclusion of the collateral source rule. In proving that plaintiff received $8,303 in insurance benefits in the three and a half years which elapsed between the collision and the trial, defendants were seeking to demonstrate that plaintiff had a motive to feign injury. As defense counsel stated in his closing argument to the jury: "[T]he evidence of insurance payments from the Automobile Club of Southern California and from the Pennsylvania Life Insurance Company were [*sic*] presented to you for the proper purpose of showing motive and this man's desire not to seek medical attention that would result in his cure, not to rehabilitate himself, not to go back to work."

Defendants rely on the decision in *Garfield* v. *Russell* (1967) *supra,* 251 Cal.App.2d 275 as authority for the proposition that evidence of plaintiff's

receipt of benefits from a collateral source is admissible to suggest a motive for malingering. In *Garfield,* the court reversed a judgment for defendant in a personal injury action on the ground that the trial court erroneously admitted evidence of plaintiff's receipt of collateral insurance benefits for the purpose of showing plaintiff was a malingerer. Recognizing the highly prejudicial impact of the evidence which "strongly suggested that plaintiff was a grasping woman who was building up a lawsuit" (251 Cal.App.2d at p. 278), the court held the trial court lacked sufficient foundation to admit the evidence under section 352.

Despite the adverse result of the case, defendants rely on the following language in *Garfield:* "Evidence that a plaintiff is being wholly or partially compensated for her medical expenses—or perhaps even making money every time she sees her doctor—may obviously be relevant on her motives in seeking medical help and her credibility as a witness, even if only remotely. . . . We know of no statute, either in or out of the Code which holds that the type of evidence with which we are concerned is inadmissible. . . . We realize that this is not the kind of reversal plaintiff seeks. Her position is that evidence of compensation from a collateral source is prejudicial as a matter of law, however relevant it may be. We see no merit in her position." (*Id.* at pp. 278-279.)

Whatever its arguable merit, the foregoing discourse does not delineate the manner in which a trial court must exercise its discretion under section 352 in cases involving offers to prove plaintiff's receipt of collateral benefits as evidence of malingering. This court subsequently considered precisely that question in *Helfend* and *Acosta.*

In both *Helfend* and *Acosta,* defendants, in addition to asserting that the collateral source rule was inapplicable to public entities, contended that the evidence of plaintiff's receipts of collateral benefits was admissible on the issue of malingering. In both cases we affirmed the trial court's decision to refuse admissibility of the evidence. In *Helfend,* we explained: *"Hoffman* [v. *Brandt* (1966) 65 Cal.2d 549 (55 Cal.Rptr. 417, 421 P.2d 425)], *Garfield,* and Evidence Code section 352 require the trial court to assess the prejudicial effect of telling the jury about insurance coverage, even with appropriate cautionary instructions, against the probability that the party who seeks to present evidence of insurance coverage can show a proper relationship between the coverage and an issue in the case. [Citation.] In the present case it would have been nearly impossible for defense counsel to show that plaintiff was a malingerer merely because he might have possessed multiple insurance coverage. Plaintiff sustained extremely severe injuries when defendant's bus crushed his arm. . . . Considering the seriousness

of his injury, the arduous nature of his employment, and his age, he remained away from work for only a short time. . . .

"We are persuaded by the reasoning of the United States Supreme Court as to whether evidence of plaintiff's insurance coverage would ever be admissible to show the extent and duration of his disability or to indicate that he might be a malingerer: 'In our view the likelihood of misuse by the jury clearly outweighs the value of this evidence. Insofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension.' " (2 Cal.3d 1, 16-17 and fn. 23, quoting *Eichel* v. *New York Central R. Co.* (1963) 375 U.S. 253, 255 [11 L.Ed.2d 307, 309, 84 S.Ct. 316].)

It is apparent that the trial court here, relying on defendant's reading of *Garfield* and without the benefit of our analysis in the two key decisions rendered subsequent to this trial, abused its discretion under Evidence Code section 352. We made clear in *Helfend* and *Acosta* that the trial court's duty is to carefully weigh the relevance and probative value of evidence of plaintiff's receipt of collateral benefits against the inevitable prejudicial impact such evidence is likely to have on the jury's deliberations. In the instant case, no such weighing process occurred. The trial court apparently assumed that defendants were entitled to produce the evidence of plaintiff's receipt of collateral insurance benefits merely on a showing of the bare relevance of such evidence on the issue of plaintiff's motive to malinger.

It can be conceded that plaintiff's receipt of $8,303 in insurance payments over three and one-half years is marginally relevant to hint a possible motive to malinger. But the relevance is minimal and the probative value of the evidence is easily outweighed by its prejudicial impact. It is uncontested that plaintiff expended over $6,000 in out-of-pocket medical costs between the time of the accident and the trial, and thus his "profit" from the insurance payments was slightly more than $2,000. It taxes credulity to conclude that receipt of such sum—less than $700 a year—would induce a rational plaintiff to abandon his chosen skilled trade and undertake a course of study to change to a less remunerative occupation.

The potentially prejudicial impact of evidence that a personal injury plaintiff received collateral insurance payments varies little from case to case. Even with cautionary instructions, there is substantial danger that the jurors will take the evidence into account in assessing the damages to be awarded to an injured plaintiff.[4] Thus, introduction of the evidence on a

---

[4]Even if the jurors do not actually deduct the collateral insurance receipts from the amount of damages they would otherwise award, knowledge of the receipts may

limited admissibility theory creates the danger of circumventing the salutary policies underlying the collateral source rule. ■ Admission despite such ominous potential should be permitted only upon a persuasive showing that the evidence sought to be introduced is of substantial probative value. (Cf. *Grudt* v. *City of Los Angeles* (1970) 2 Cal.3d 575, 588-593 [86 Cal.Rptr. 465, 468 P.2d 825].)

When the evidence of collateral insurance receipts is offered to indicate that plaintiff is a malingerer, there is additional prejudice likely in permitting him to be characterized as "a grasping [person] who [is] building up a lawsuit." (*Garfield* v. *Russell* (1967) *supra,* 251 Cal.App.2d 275, 278.) Such disparaging reflection on character seems unjustified merely because a plaintiff had previously taken the precaution and demonstrated the prudence to purchase disability insurance coverage.[5]

We do not hold, as the United States Supreme Court suggested in *Eichel* v. *New York Central R. Co.* (1963) *supra,* 375 U.S. 253, 255, that the prejudicial impact of evidence relating to plaintiff's receipt of collateral insurance payments will inevitably outweigh the probative value of such evidence on the issue of plaintiff's motives and credibility. We adhere to the standard of judicial discretion prescribed in Evidence Code section 352. ■ However, we do hold that the evidence must have substantial probative value as proof that the plaintiff is a malingerer. Before a trial court may admit such evidence on the issue of plaintiff's motives, the court must examine all the relevant facts in the case, e.g., the amount of plaintiff's out-of-pocket medical expenses, his past and future earning capacity, the seriousness of his injuries and their prognosis, the length of his absence from work, etc., and then be satisfied that the evidence of collateral source receipts establishes a strong inference that plaintiff was motivated by the insurance receipts rather than by the actual disabling extent of his injuries. If defendants fail to make an adequate showing, the prejudicial impact of the collateral source evidence will render it inadmissible under Evidence Code section 352.[6] Such determination should be made outside of the presence of the jury.

---

"irretrievably upset the complex, delicate, and somewhat indefinable calculations which result in the normal jury verdict." (2 Cal.3d at pp. 11-12.)

[5]Professor Wigmore, referring to the relevance of liability insurance to show recklessness, explains: "[T]he inference is too elusive to be serviceable as evidence, depending as it does on a peculiar temperament which is by no means general; so that to use the inference against a particular person would be unfair." (2 Wigmore on Evidence (3d ed.) § 282a, at p. 151.) The same observation might be made about inferring that a plaintiff is a malingerer from the fact he has received disability insurance payments.

[6]For cases in other jurisdictions reaching a similar result, see *Black* v. *Nelson* (1967) 246 Ore. 161 [424 P.2d 251, 254-255]; *Kainer* v. *Walker* (Tex. 1964) 377

It is clear, of course, that even if defendants are unable to make the requisite showing on the collateral source, as they will be in many instances, they are not precluded from offering other evidence tending to indicate that plaintiff's physical complaints are feigned and that he is a malingerer. As the Supreme Court stated in *Eichel,* "there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension." (375 U.S. at p. 255 [11 L.Ed.2d at p. 309].)

■ We conclude, therefore, that the trial court erroneously admitted the evidence that plaintiff received compensation from his automobile liability insurance and disability insurance policies. Although liability was not challenged, the issue of damages was sharply contested and the damage award was small; thus "it is reasonably probable that a result more favorable to [plaintiff] would have been reached in the absence of the error." *(People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see also *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 300 [85 Cal.Rptr. 444, 466 P.2d 996].)

The judgment is reversed and the case remanded to the trial court for a new trial on the issue of damages.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

S.W.2d 613, 617; *Traders & General Insurance Company* v. *Reed* (Tex.Civ.App. 1964) 376 S.W.2d 591; *Healy* v. *Rennert* (1961) 9 N.Y.2d 202 [213 N.Y.S.2d 44, 173 N.E.2d 777, 778-779].