Don Van VRANKEN, on behalf of himself and all others similarly situated, and Lew & Ted's Service, Inc., Plaintiffs,

v.

ATLANTIC RICHFIELD COMPANY, Defendant.

No. C–79 0627 SW.

United States District Court, N.D. California.

Sept. 26, 1988.

Josef D. Cooper, Douglas A. Marshall, San Francisco, Cal., Tracy R. Kirkham, Hennigan & Mercer, Los Angeles, Cal., for plaintiffs.

F. Bruce Dodge, Samuel R. Miller, Morrison & Foerster, San Francisco, Cal., for defendant.

SPENCER WILLIAMS, District Judge.

On April 4, 1988, parties made cross-summary judgment motions on the issue of volumetric apportionment, known as the "V factor." The parties also briefed the issue of whether any money sent to plaintiff class members from the Department of Energy pursuant to the Special Refund Proceeding HEF–0591 can be offset against any damages award. After oral argument, the court took the matters under submission. On June 1, 1988, this court filed its ruling which granted partial summary judgment in favor of the plaintiff class represented by Don Van Vranken and denied defendant's motion for summary judgment on the V factor issue. Section II of the order addressed the issue of damages.

After the order was filed, counsel for both parties brought to the court's attention certain typographical errors and mischaracterizations contained in the order. Therefore, this court now files this corrected order *nunc pro tunc* June 1, 1988.

REGULATORY BACKGROUND

Any coherent resolution of this complex and somewhat anachronistic aspect of the petroleum regulations requires at least a brief discussion of the unique background that applies to this case.

In 1974, when the authority to regulate the oil industry passed from the Cost of Living Council to the Federal Energy Office (FEO), the FEO established a cost allocation formula for the oil industry. At that time, authority to regulate the oil industry was derived from two statutes, the Economic Stabilization Act, 12 U.S.C. § 1904 note (hereinafter ESA), which controlled the price of most of the goods and services in the nation's economy, and the newly enacted Emergency Petroleum Allocation Act, 15 U.S.C. § 751 (hereinafter EPAA), which controlled the price of crude and refined petroleum products. The FEO formula provided for volumetric apportionment of crude oil costs known as the "V factor." Its purpose was to allocate the total increased crude oil costs among various refined products. The V factor is a fraction. Under the EPAA, the numerator consists of the total volume sold of a particular product in a specified time period. The denominator is the total volume of all "covered products other than special prod-

ucts" sold in that same period. Among covered products, the refiners could redistribute increased costs from whichever of these products the refiner chose.[1] For the special products, the refiner had to apportion exactly a pro rata share of costs from the refiner's increased costs associated with that special product.

When the ESA expired in 1974, the Department of Energy lost its authority to regulate certain petroleum by-products. However, the ESA expiration did not require the DOE to amend its cost allocation formulas. The successor statute to the ESA, the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 [hereinafter EPAA], exempted certain petroleum by-products which previously fell under the price controls of the ESA.[2] On April 3, 1974, DOE amended the regulations to redefine "covered products." It excluded those products which it no longer had authority to regulate.

Unfortunately, the agency neglected to alter its allocation formulas for the products. To keep the regulations internally consistent, DOE should have included the newly exempted petroleum by-products in the V factor denominator which would have had the effect of excluding their costs from those available for allocation to regulated products. On April 30, 1974, the date the ESA expired, DOE promulgated an amendment to the Mandatory Petroleum Price Regulations which included petroleum by-products in the V factor denominator. 10 C.F.R. § 212.83(c)(2) [hereinafter April 30, 1974 amendment].[3] The upshot of this amendment was that refiners could no longer reapportion to the price of covered products their increased costs attributable to these petroleum goods in any manner they desired. Mobil Oil Corporation was one refiner that made its objections to the amendment known to DOE through admin-

istrative remedies. DOE rejected Mobil's protests. Finally, Mobil Oil sued.

DISCUSSION

I. Volumetric Apportionment

Don Van Vranken represents the plaintiff class. It has charged ARCO with improperly reallocating exempt products to justify prices it charged the plaintiff class for regulated products. The class claims that up to $343 million of exempt product costs are in excess of the maximum allowed by law.

Four conflicts surface in the cross-motions for summary judgment. First, the parties dispute whether prior litigation between Mobil Oil Corporation and the Department of Energy only provided relief to Mobil based on an injunction which granted Mobil Extraordinary Exception Relief from the V factor regulations after a showing of serious hardship. Second, ARCO believes the voiding of the April 30, 1974 amendment *requires* it to now add exempt product costs to covered product prices. Plaintiff class, however, argues that ARCO's figures amount to illegal retroactive reallocation. Third, plaintiff class contends that if ARCO is allowed to add exempt product costs it is limited to three months—May, June and July 1974—because three V factor regulations promulgated in August 1974, December 1974 and March 1975 prohibit the allocation of exempt product costs to covered product costs. Finally, it must be resolved whether ARCO sought and received permission from DOE to add exempt product costs.

### A. *Application of the Mobil Decisions*

Defendant ARCO contends that three decisions by the Temporary Court of Appeals —or TECA—provide an avenue for refiners like ARCO to add the increased costs to the V factor they used. The defendant's interpretation is too broad. These cases, the

---

1. Alternatively, the refiner could "bank" these increased costs and use them to offset any future overcharges for which the refiner might be responsible.

2. These products were petroleum coke, petroleum wax, asphalt, road oil and refinery gas. The substances are petroleum by-products, or refin-

ery residue, that result from the processing of crude oil into refined products such as gasoline.

3. The denominator was changed to include "the total volume of all covered products and all products refined from crude petroleum other than covered products...."

*Mobil* decisions, do not necessarily apply across the board to all refiners similarly situated.

In *Mobil Oil v. Dep't of Energy*, 610 F.2d 796 (TECA 1979) [hereinafter *Mobil I*]. TECA upheld a district court holding and ruled in favor of Mobil. The court held that DOE had failed to consider each of the statutory commands of the EPAA when it promulgated the April 30, 1974 amendment. Thus, the amendment was procedurally invalid. In addition, DOE failed to provide notice and comment to interested parties as usually required by the Administrative Procedures Act, 5 U.S.C. § 553 [hereinafter APA], for informal rulemaking procedures. TECA established that none of the exceptions to the notice and comment requirement applied to DOE. For instance, DOE could not argue that the expiration of ESA came as a surprise. Nor did the agency's forgetfulness provide an excuse. Accordingly, TECA reaffirmed the district court's holding that the amendment was "arbitrary and capricious" and therefore "null and void." *Id.* at 805.

The district court had ruled that Mobil could retroactively allocate increased costs from exempt petroleum by-products "continuously from April, 1974 up to the present [November, 1979]." *Id.* TECA held that a portion of this district court judgment contravened a December 1975 amendment to the EPAA which prohibited any method other than direct proportionate distribution of cost pass-throughs to certain products, including No. 2 heating oil and No. 2 diesel fuel, aviation fuel and propane produced from crude. 15 U.S.C. § 753(b)(2)(D). Accordingly, TECA remanded the case for findings consistent with these restrictions.[4] On remand, the district court held that Mobil could reallo-cate its costs from April 1974, except that from February 1, 1976 forward, the restrictions on products such as No. 2 heating oil applied. Thus, Mobil could allocate exempt product costs to covered products for the period prior to February 1, 1976.[5]

In *Mobil II*, DOE appealed the remanded district court holding. *Mobil Oil Corp. v. Dep't of Energy*, 647 F.2d 142 (TECA 1981). DOE urged that Mobil should not be allowed to reallocate increased crude oil costs from exempt products to covered products after February 1, 1976. TECA agreed, and held that Mobil could reallocate only for the period preceding February 1, 1976. TECA did point out that the *Mobil I* decision did not address the question of whether the later rulemakings, such as the February regulation, validly promulgated the same regulation on their effective dates.

In *Mobil III, Mobil Oil Corp. v. Dep't of Energy*, 678 F.2d 1083 (TECA 1982), TECA dealt with DOE's attempted third bite at the apple and the subsequent abolishing of the V factor altogether. On January 16, 1981, DOE adopted a regulation which retroactively repromulgated the April 30, 1974 amendment to the April 1974 date. TECA ruled that DOE could not retroactively repromulgate its rule. The decision in *Mobil I* had made it clear that the April 1974 amendment was not necessary to fulfill the EPAA's design. Thus, a retroactive statute did not fulfill that design. *Id.* at 1090.

In addition, the February 1, 1976 and other subsequent amendments brought in a new cost allocation, the "R factor," for the old V factor.[6] Energy Policy and Conservation Act (EPCA), 42 U.S.C. § 6201 et seq.

---

4. *Mobil I* also established that a new rulemaking in September 1974 did not cure the April 30, 1974 amendment problems. First, TECA held that the September statute addressed non-product costs pass-throughs. The April 1974 amendment concerned product cost pass-throughs, so the two were unrelated. Second, TECA noted that an opportunity for notice and comment regarding a subsequent rulemaking cannot cure previous rulemaking defects. *Mobil I*, 610 F.2d at 805 n. 11.

5. The district court used the February 1976 date instead of December 1975 because the December statute directed new regulations to take effect no later tha February 1, 1976. 15 U.S.C. § 758.

6. The V factor was based on volume of products sold. The R factor was based on volume of products refined. The V factor was eliminated entirely as of March 1, 1977 in favor of the R factor.

TECA ruled that this substitution was prospective enforcement and therefore proper. *Mobil III*, 678 F.2d at 1091.

In accordance with its filing regulations, DOE set up a specific grace period and appeal process to determine whether the agency would accept refilings based on the new invalidation of the April amendment. There was no carte blanche for all refiners to refer to the *Mobil* decisions and increase their costs.

In general, DOE did not allow refiners to refile cost allocation reports that sought to change the allocation of crude oil costs based on the invalidation of the April 1974 amendment unless the refiners applied within the grace period or with the permission of the DOE. The agency noted that, if permitted, the filings could result in total refiner claims for retroactive increases in banked costs of over $50 billion at that time. 45 Fed.Reg. 58,872–73 (Sept. 5, 1980).[7]

The court agrees with the concerns expressed in *Kickapoo Oil Co. v. Murphy Oil Corp.*, No. C 78–478, slip op. at 17–24 (W.D.Wis. Dec. 28, 1983). There, the court concluded that, while DOE could not enforce the invalid regulation against nonparties to the *Mobil* cases, those regulations do not necessarily enable all those who applied the invalid regulation to later seek reallocation of their crude oil costs increases.

The court does not, however, accept the interpretation of the *Mobil* decisions offered by the plaintiff class. It suggests that the scope of the decisions is limited to Mobil Oil Corporation because the holdings provided emergency relief in accordance with an injunction. This is a misreading of

the cases. TECA struck down the April 30, 1974 amendment because it did not follow the APA or the EPAA. The court clearly did not reach the issue of whether DOE was justified when the agency turned down Mobil's administrative appeals for emergency relief.

## B. *Reallocation of Exempt Product Costs*

■ Having held that the *Mobil* decisions do not automatically allow ARCO to reallocate its crude oil costs, this court must next determine whether the April 30, 1974 amendment allows or mandates ARCO add these costs to its covered product prices. The plaintiff class has asked this court to rule that ARCO cannot inject additional increased costs into its banks today when those costs were not contained in contemporaneous filings with the DOE. For the reasons presented below, the court rules in favor of the class.

### 1. The relevant issues.

ARCO contends that plaintiff class has mischaracterized the nature of the issue presented. The refiner suggests that the question is whether the class can establish that it was in fact overcharged during the applicable time period. In antithesis, the court believes ARCO's approach places the cart before the horse.

ARCO relies on the ruling expressed in *Longview Refining Co. v. Shore*, 554 F.2d 1006 (TECA), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). In that case, the court ruled that the customer had not shown that the refiner had failed to implement the price regulations.[8] Here,

---

**7.** Indeed, DOE prophesied the exact complaint Van Vranken makes here:

> Many (refiners) have claimed that, because the April 30, 1974 rule was declared invalid, their pool of increased costs for the period thereafter can be enlarged, such that alleged violations based on their contemporaneously reported increased costs are either diminished or obliterated.

46 Fed.Reg. 7782 (Jan. 23, 1981). DOE found no good cause to allow this to happen.

**8.** Shore complained that Longview Refining charged them too much for gasoline and diesel

as allowed under the applicable regulations. TECA struck down the district court's findings of facts and conclusions of law because the facts did not sufficiently support a conclusion that an overcharge occurred. TECA noted that "plaintiffs have the burden in this case to provide the specific data needed to prove the existence of an overcharge." *Longview*, 554 F.2d at 1011. TECA found many aspects of the district court's findings lacking in foundation, including the fact that the district court apparently only used plaintiff's version of the proper pricing structure.

this court must first determine what the pertinent price regulations require. Then, after applying those regulations, plaintiff class must establish that actual overcharges occurred, by, among other things, showing that ARCO improperly inflated its banked costs used to support prices. *See Kickapoo Oil Co. v. Clark Oil and Refining*, 788 F.2d 11, 20 (7th Cir.1985); *Longview*, 554 F.2d at 1011. Finally, the class must then show that the overcharges or excessive banks were made with the requisite intent and willfulness. *Id.* at 1023.[9]

2. Recovery of exempt product costs.

ARCO urges this court to rule that the refiner must follow the pre-April 30, 1974 definition, that this definition required the recovery of the five later exempted product costs in covered product prices, and the invalidation of the April 30 amendment continued this mandate until February 1, 1976. This cannot be.

Obviously the *Mobil* decisions invalidating the April 1974 amendment establish that a plaintiff cannot sue for over-recoveries which stemmed from a refiner's improper use of this rule. The decisions indicate that correct posture for a refiner in an exogenous world would have been to ignore the amendment and to continue to include the exempt product prices in the denominator of the V factor.[10] Refiners like ARCO, however, followed the amendment and excluded the prices. The fact that the *Mobil* decisions later invalidated

the amendment does not mean that ARCO can now go back and allocate more costs to the products it sold and thus expand its banked costs. The court notes that this proposal would be akin to permitting a refiner to return to its customers after a dozen years had passed and inform them that it undercharged them: The refiner mistakenly operated under a recently invalidated regulation which set the prices too low, so it should now be permitted to ask the customers to pay the difference on products sold and consumed many years ago. Whether the costs are banked for the future or extracted from the customer in the price of today's goods, the result is the same.

The court finds support in the reasons expressed in *Kickapoo* and *Naph–Sol Refining Co. v. Murphy Oil Corp.*, 550 F.Supp. 297 (W.D.Mich.1982) *modified on other grounds, sub nom. Mobil Oil Corp. v. DOE*, 728 F.2d 1477 (TECA 1983). These courts concluded that DOE had indeed set forth an invalid April 1974 amendment. As a result, the amendment was improper, and refiners were to use the old, albeit internally inconsistent, rule which removed EPAA exempt products from the V factor denominator.[11] Thus, the *Mobil* decisions allowed the refiners to use the amendment resulting from the DOE's slip-up. But the refiners were not required to use the amendment at that time. *Id.* As

---

**9.** TECA also relied on the absence of a showing of intent in its reversal in *Longview*. The court noted that a § 210 action requires plaintiff to prove that defendants "intentionally charg[ed] a price known to be in excess of the applicable ceiling price allowable under the pricing regulations." *Id.* at 1022–23. Clear proof of willfulness is required because of the complexity of the regulations: The court remarked that these regulations were so convoluted that even the government could not determine how to properly calculate the pricing structures. The *Longview* court speaks of willfulness "in the criminal sense." Nonetheless, here TECA seems to refer to the accountants' inability to understand what they were supposed to do. It is unclear how TECA would have ruled if the court had found that the refiner understood the regulations but still failed to follow their requirements. Thus, it is not clear that, in the case before this court, the plaintiff class must show ARCO acted with criminal intent. In addition, this problem was

not crucial to TECA's analysis; TECA clearly could reverse the district court without relying on this issue. Finally, TECA does warn that "mere failure to employ the formula" is not a "legal wrong." But this proscription provides for the case when the refiner fails to follow the price formulas but still manages to charge the customer less than the price to which the refiner is entitled.

**10.** The court does not think it unrealistic that refiners might indeed realize that the EPAA was always intended to remain consistent even after the expiration of its predecessor ESA and keep exempt products and covered products separate.

**11.** As noted above, the denominator should have included volumes of both covered products and exempt products in order to exclude exempt product costs from allocation to covered product prices. Discussion, *supra*, at 1421–22.

plaintiff class points out, the *Mobil* courts always used permissive language rather than compulsory language when describing Mobil's ability to allocate costs.

The court finds the reasoning in *Kickapoo* particularly persuasive on this point. There, the court noted that the only directives the price regulations ever contained regarding exempt product costs were prohibitions barring their use to justify increasing covered prices. The court interpreted the effect of the invalidation of the April 30 regulation on the cost allocation as a temporary suspension of this prohibition. It follows that this temporary suspension does not automatically compel the addition of exempt product costs to the covered prices calculation. As recognized in *Kickapoo*, it was never a violation of the regulations to not increase covered product prices in order to recover exempt product costs, even during the period that the April 30 V factor prohibition was void.

It is one thing to allow refiners a pricing practice which violated the spirit of the EPAA but held consistent to the letter when that regulation was in effect. It is a different thing to allow the refiner to retroactively use that inconsistent regulation to its benefit now that the regulation is outdated. Indeed, this reasoning is the underpinning of the decisions in *Tenneco Oil Co.*, 1 DOE § 85,512 (1977), and *Eastern Airlines, Inc. v. Atlantic Richfield Co.*, No. 74-1207 Civ-JM (S.D.Fla., Jan. 12, 1982), [available on WESTLAW, 1982 WL 1141], *aff'd*, 712 F.2d 1402 (TECA 1983) and points to the root of the persuasiveness of those cases to that here. This court is aware that the subject of those cases was voluntary reallocations of "H factor dollars",[12] and not recalculation of the V factor, as is the case here. In those cases, the seller chose the amount of costs to assign to particular products and then later sought to reallocate costs to eliminate over-

recoveries. The courts refused to allow this practice. The reasoning they expressed counsels against unnecessary retroactive reallocations in general and indicates compelling policy concerns that this court, too, must consider.[13]

Accordingly, this court rejects the suggestion by ARCO that it analogize the case here to that in *Mamula v. Commissioner of Internal Revenue*, 346 F.2d 1016 (9th Cir.1965). In that case, a taxpayer, in good faith, reported income pursuant to a method which the government determined to be incorrect in a subsequent audit. The court found he was not bound to the method he chose because the IRS had ruled that it did not appropriately apply to his income source. The court allowed him to chose one of two other methods available to recalculate the tax; naturally, he chose the system which better benefitted his finances.

That is what ARCO would like to do here: chose between the pre-amendment posture or the April 1974 amendment requirements to achieve the highest banked costs. Yet, in the case before this court, the government has never ruled that a recalculation is required.[14] Furthermore, the concept of volumetric allotment was considered fundamental to the framework of the petroleum regulations. Unlike the law in *Mamula*, the prohibition required by the April 30, 1974 amendment had always been, and later continued to be, the heart of the volumetric regulations. The method of tax payment in *Mamula* never was the appropriate choice for that plaintiff to follow. The fact that he was later allowed to correct his mistake cannot be relevant to ARCO's predicament.

### C. *ARCO's Revised Cost Forms*

■ Because this court holds that ARCO's recalculation of its V factor constitutes an improper retroactive reallocation of its exempt product costs, the court need

---

**12.** These reflect the costs allocated into and out of a product group.

**13.** Similarly, the *Naph–Sol* court noted that public policy should prohibit letting a seller retroactively adjust its prices in order to benefit itself. 550 F.Supp. at 313.

**14.** The courts in *Naph–Sol,* 550 F.Supp. at 313, and *Kickapoo,* No. C 78–478, at 21–24, make a similar distinction.

not address the issue of the August 1974, September 1974 and March 1975 subsequent rulemakings. Instead, this court must next confront the issue of ARCO's revised cost forms. If ARCO had received permission from the DOE to include the exempt products costs in its covered products costs, or if ARCO ever applied to the DOE during a grace period, it is possible that the refiner might still be allowed to adjust its V factor as it desires. The court determines that ARCO did neither of these things.

10 C.F.R. § 212.126(d) states that the refiner must obtain DOE's written permission for any refiling that covers a period more than one year prior to the resubmission:

> (1) DOE will routinely accept resubmissions or refiling of such reports only within one year after the original refiling or submission. Any entry contained in an' otherwise timely report which purports to change or adjust retroactively an entry or allocation contained in a report previously filed or submitted shall be considered a refiling or resubmission ... and will not be given force or effect absent compliance with the provisions of this paragraph.

> (2) *Exceptions* Notwithstanding the provisions of subparagraph (d)(1) of this section, a refiner may resubmit or refile reports ... where DOE grants written permission to resubmit or refile for good cause shown.

ARCO did make R factor refilings. ARCO points to three aspects of the R factor revisions to imply it resolved its volumetric apportionment problems with DOE. In a Proposed Remedial Order, ERA No. RARH00204, September 30, 1983, DOE challenged ARCO's R factor adjustments for March 1979 through December 1980. ARCO claims that the PRO specifically declined to challenge or criticize the refiner's V factor adjustment. Actually, the' PRO directs nothing to the V factor in the face

of the Order. Absence of a discussion does not carry any significance.

ARCO further relies on another inapplicable document. When ARCO applied for the R factor refilings, DOE wrote a response brief. Response of Economic Regulatory Administration to Statement of Objections of Atlantic Richfield Company, No. HRO-0223. At footnote 79, the Response noted that DOE did not challenge the propriety of allocating exempt product costs to all covered products before February 1, 1976. But that remark clearly refers to the TECA rulings in *Mobil*, not to any such requests specifically made by ARCO. ARCO leaves this distinction out.

Finally, ARCO relies on another footnote, number 77, in the same Response. The DOE noted that, with respect to ARCO's refilings in August 1981, it did not object to "legitimate costs incurred" if ARCO accurately reported them consistent with the regulations. It is clear that DOE is agreeing to nothing more than what ARCO was entitled to by law. This footnote does not take the place of written acceptance of a refiling as required by the statutes. Indeed, as counsel for DOE commented at oral argument, a footnote in a brief could not imply the DOE's acceptance of a refiling.[15]

## II. Damages

■ In 1985, ARCO and DOE settled a number of pending administrative proceedings pursuant to § 211 of the ESA. *See* 50 Fed.Reg. 8366, 8368 (March 1, 1985). As described in the Notice of Proposed Consent Order, upon execution of the settlement:

> ARCO deposited $65.7 million in an interest bearing escrow account pending public consideration of the settlement. If the Consent Order is made final, ERA will petition the Office of Hearings and Appeals (OHA) to implement a Special Refund Proceeding pursuant to 10 C.F.R. Part 206, Subpart V. In that proceeding,

---

**15.** In supplemental information, ARCO brings up an attempt it made at refiling on March 24, 1982. Apparently, DOE ignored this submission because it was made after the regulations ex-

pired and during settlement negotiations in DOE enforcement proceedings. Thus, this too lacks the permission required and lacks "force or effect."

any person who claims to have suffered injury from ARCO's alleged overcharges would have the opportunity to submit a refund claim to OHA.

*Id.* at 8366. Plaintiff class contends that money paid to its members from the Consent Order fund is "collateral" to the treble damages awardable under the class' own private cause of action under § 210. The class also argues that the Consent Order fund is attributable to overcharges which are not currently recoverable in this action. As explained below, such a ruling would permit an excess of recovery to the class members.

First, the DOE settlement pertains to alleged overcharges related to ARCO's compliance with the Mandatory Petroleum Price Regulations during the period of January 1973 through January 1981. The escrow fund is intended to provide restitution to purchasers of ARCO's refined petroleum products during this time. 50 Fed.Reg. at 8371. The Consent Order clearly covers damages claimed in plaintiffs' private cause of action. Indeed, earlier this year, parties signed a settlement agreement regarding the class' § 210 claims with money that would have come from the Consent Order fund.

Second, the collateral source rule provides that "if an injured party received some compensation from a source wholly independent of the tortfeasor, such payments should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." *Hrnjak v. Graymar, Inc.*, 4 Cal.3d 725, 729, 94 Cal.Rptr. 623, 484 P.2d 599 (1971). Plaintiff class uses this rule to assert that DOE's actions are remedial and therefore have no bearing on any award made in this case. The class cites to *Bulzan v. Atlantic Richfield Co.*, 620 F.2d 278 (TECA 1980). It is correct insofar as the DOE's administrative enforcement action does not affect the class' right to *file and maintain* a private cause of action under § 210. However, *Bulzan* does not stand for the proposition that the class may collect twice from ARCO. Other cases support this conclusion. The court in *U.S. Oil Co., Inc. v. Koch Refining Co.*, 518 F.Supp. 957, 962

(E.D.Wis.1981), recognized that administrative enforcement actions and separate private actions could expose a defendant to double liability. The court went on to note that this problem is eliminated if courts "reduce any potential exposure by offsetting any amount a particular plaintiff might recover by way of DOE's actions against any recovery for a private suit. DOE could also offset recoveries in private suits against any restitution order." *See also Martin Oil Service, Inc. v. Koch Refining Co.*, No. C 81–1844, slip. op. at 4 (N.D.Ill. Oct. 18, 1982) (where the court suggested the offset problem may be minimized if a defendant who has already paid restitution on a private action may assert this as a defense to an enforcement action by DOE).

The court does agree with the plaintiff class in that the offset should be subtracted from the total amount of damages *after* trebling. In actions like this where treble damages are available, the plaintiff is entitled to full satisfaction of the claim for harm done. The amount awarded as damages is then trebled as punishment to the defendant. If the offset were subtracted from the initial damage award, the class members would be denied the full satisfaction of their claim.

CONCLUSION

This court has held that ARCO's attempts to alter its banked costs constitute an improper retroactive reallocation of its exempt product costs. Accordingly, it grants partial summary judgment to the plaintiff class represented by Don Van Vranken on this issue. ARCO may offset money that would go to these class members from the DOE Consent Order fund against any amount of damages due the members under their private cause of action. The offset will be made after damages are trebled.

IT IS SO ORDERED.