[No. C047658. Third Dist. Apr. 26, 2005.]

JAMES SMALLEY, Plaintiff and Appellant, v.
ORVILLE RAY BATY, JR., et al., Defendants and Respondents.

## Counsel

Trezza, Ithurburn, Steidlmayer & Ithurburn and Mark G. Steidlmayer for Plaintiff and Appellant.

Porter, Scott, Weiberg & Delehant, Katie Bellotti Porter, Anthony S. Warburg and Brendan J. Begley for Defendants and Respondents.

## Opinion

**SIMS, J.**—In this personal injury case where defendants conceded liability and contested only damages, the trial court granted defendants' motion to exclude evidence that plaintiff had paid his own medical bills. The jury ultimately awarded plaintiff less in economic damages than he had already paid out of pocket for medical expenses. We conclude the trial court's ruling was a prejudicial abuse of discretion that compels reversal.

### FACTUAL AND PROCEDURAL BACKGROUND

On March 11, 2003, plaintiff James Smalley, having stopped on Lindhurst Avenue in Yuba City to make a left turn, was rear-ended by a truck driven by

defendant Orville Ray Baty, Jr., while in the course of his employment by defendant California Cascade Industries, Inc.

On August 15, 2003, Smalley filed a complaint for personal injury against defendants. The case came on for jury trial on June 8, 2004.

Before trial, defendants moved to bar plaintiff from introducing evidence that he had paid his medical bills personally. They asserted that, though "marginally relevant to the issue of special damages," such evidence should be excluded because "an over emphasis [sic] on the fact that the Plaintiff personally paid for medical treatment in an attempt to argue that his treatment was somehow more necessary or more important than had his medical insurance paid for it is not relevant. In addition, the admission of such evidence would likely prejudice the jury in that they may attach undue significance to the fact that the Plaintiff paid rather than his medical insurance." Furthermore, "[e]xcluding such evidence is consistent with the collateral source rule which would prevent Defendants from admitting [sic] evidence demonstrating that the Plaintiff's insurance paid for his medical treatment." Defendants did not cite authority for any of these propositions.

The trial court granted defendants' motion.[1] Thus, Smalley was allowed to show that medical expenses had been incurred and paid, but not that he had paid them himself.

*Smalley's case*

On March 11, 2003, defendant Baty's truck, traveling around 31 miles per hour, rear-ended Smalley's stopped vehicle and forced it off the road. The front seatback was forced out of line so that it pointed toward the trunk. The vehicle was totaled.[2]

After the accident, Smalley was taken to the hospital by ambulance, treated, and discharged.

The next day, Smalley saw his primary care physician, Dr. William Irvine, who had treated him for 10 years. Smalley complained of pain and stiffness in his neck, upper back, and lower back; he also mentioned a recently noticed lump in his left groin. Dr. Irvine found muscle spasms in the thoracic and

---

[1] The in limine argument is not in the record, and the minute order setting out the ruling does not discuss the trial court's reasoning.

[2] Smalley did not own the vehicle. It belonged to the used car dealership in which he was a partner at the time.

lumbar areas of Smalley's neck; these were objective symptoms, not merely subjective complaints. There was also tenderness in the groin. A hernia developed there later; Dr. Irvine referred Smalley to a specialist who repaired it surgically. When asked if the "type of trauma" Smalley suffered in the accident was "consistent with causing a hernia" detected soon after the accident, Dr. Irvine answered affirmatively.[3]

Smalley, aged 53 at the time of the accident, had a history of osteoarthritis, including the cervical spine, but had never complained of neck pain or discomfort before the accident. A history of osteoarthritis renders a person more vulnerable to injury in rear-end collisions.

Dr. Irvine referred Smalley to physical therapy for his muscle spasms. As of the time of trial, Smalley had undergone 118 physical therapy sessions. Dr. Irvine, who had seen him three more times since the initial visit, approved of this course and amount of treatment.[4]

Dr. Irvine noted that physical therapy is often palliative rather than curative. Sometimes it takes a year or two after an injury to determine whether the disability is permanent. Judging by the reports from physical therapist Gail Doty, Smalley had been faithfully following the therapy, but remained "limited" and would probably never be "back to normal"; his problem was chronic.

Dr. Irvine had recently referred Smalley to an orthopedic surgeon to evaluate the progress of his physical therapy. The orthopedic surgeon had suggested chiropractic in addition to the physical therapy.

Gail Doty testified that she had been treating Smalley for almost a year (succeeding his original physical therapist) and was still doing so twice a week as of the time of trial. He was always in pain when he came in; usually he was still in pain when he left, but not so much. Some of his vertebrae were not correctly positioned or moving as well as they should, and the fascia, or connective tissue, was very restricted in spots. He also suffered from "muscle tightness" (a term Doty used instead of "spasm"). Doty's reports noted both Smalley's subjective complaints and her own objective assessments. It was

---

[3] On cross-examination, Dr. Irvine admitted that hernias are normally caused by straining or lifting, that he had never seen a hernia caused by an automobile accident in any other case, and that he had not encountered such a case in the medical literature.

[4] On cross-examination, Dr. Irvine acknowledged that he had "hoped" and expected Smalley's soft tissue injuries would resolve with short-term physical therapy.

her practice to treat a patient for as long as she thought it could benefit him; if it could no longer help, she would tell the patient so and discharge him.

Smalley testified that he was a veteran automobile salesman who had risen to general sales manager at a Yuba City dealership, then become a partner in a used car business. After the accident, however, he had had to quit that business and go back to work for his former employer because he could no longer handle the physical demands of running a business.

Before the accident Smalley jogged three miles a day, golfed several times a week, played softball, basketball, and baseball, and went skiing, camping, and horseback riding with his family. Since the accident, he had been unable to do any of these things because of chronic pain.[5] He no longer even walked except as necessary.

Before the accident Smalley often worked 10 to 14 hours a day; now he did only seven or eight hours. After work he mostly just watched TV, sitting in a "vibrator[-]type chair" that helped his back somewhat, or sitting on a massager and a heating pad. He slept poorly, waking up many times each night because every movement caused pain.[6]

Smalley testified that he had followed the recommendations of his treating doctors and physical therapists "to the letter." He constantly asked them if they were "seeing any light at the end of the tunnel," but even after 15 months they apparently did not.

Smalley presented his medical bills in evidence and testified that they had almost all been paid. The total sum charged was $29,409.58; the total sum paid so far was $28,961.58.[7]

---

[5] On cross-examination, Smalley admitted that no doctor or physical therapist had told him he could not do these things.

[6] Smalley's wife testified similarly as to his prior and present activities and his chronic pain. His former partner in the used car business testified that after the accident Smalley was unable to sit down at work, instead standing up and walking around to try to get comfortable. His former and present employer testified that before the accident Smalley worked extremely long hours and never complained of physical problems, but after the accident he had trouble sitting at his desk even with the help of braces and heating pads and would have to take breaks occasionally to relieve his discomfort.

[7] The specific charges are as follows: "Ambulance"—$632.22; "Hospital—ER"—$844.10; "Medical Supplies"—$266.80; "Sears Optical" (presumably to replace glasses broken in the accident)—$245.71; "X-Rays"—$187; "CT scan"—$851; "Blood tests etc."—$536; "MRI"—$2,512; "Dr. Irvine"—$548; "Dr. Ekdawy" (the surgeon who repaired Smalley's hernia—$1,683; "Anesthesiologist"—$800; "Hospital-Operation"—$4,752.50; "Dr. Aslie" (an orthopedic surgeon to whom Dr. Irvine referred Smalley)—$413; "Prescriptions"—$1,145.25; "Physical Therapy"—$13,708; "Dr. Price/Chirop."—$285. All these sums were paid in full except for "Physical Therapy," as to which $13,260 had been paid.

*Defendants' case*

Defendants' only witness was Dr. John Cranston, a retired orthopedic surgeon who now practiced in the areas of "evaluation medicine and workers' comp[ensation] and personal injury." Having examined Smalley on October 16, 2003 (around eight months after the accident), and reviewed the records in the case, Dr. Cranston opined that Smalley's accident had caused only minor soft tissue injury to the neck and thorax that should have resolved in two months at most. It could not have caused his hernia because hernias result from repetitive injury; Dr. Cranston had never seen or read of another case where a hernia was ascribed to an automobile accident.

Neither the physical examination nor the records and depositions Dr. Cranston reviewed disclosed any objective basis for Smalley's claim of chronic pain from the accident date up to the time of trial. The postaccident emergency room report was entirely negative except for a finding of pain involving cervical and upper thoracic vertebrae, based on Smalley's subjective complaints. During Dr. Cranston's examination, all objective indicators as to posture, movement, strength, and reflexes were normal, including the neck and back. However, Smalley complained of widespread "diffuse tenderness," which "makes you wonder" because injury normally occurs in discrete places; such a complaint raised a "red flag."

In Dr. Cranston's opinion, there was no medical reason for Smalley to have continued to receive twice-a-week physical therapy as of October 2003. According to Dr. Cranston, "[t]he problem was persistent pain in the face of more than adequate treatment" with "[n]o classic objective findings of injury." In other words, no physical findings explained why Smalley was not getting better.

On cross-examination, asked whether Smalley was "a malingerer," Dr. Cranston replied: "I don't like the term malingerer. That's kind of pejorative. But I think we'd all be naive not to say there isn't self-interest involved in these proceedings." Asked whether it was "self-interest here for monetary gain" that caused Smalley to say he was hurting, Dr. Cranston said: "It may be influenced by that, yes."

*The verdict*

By special verdict, the jury awarded Smalley total damages of $20,500, of which $15,000 was for "[p]ast economic loss, including medical expenses." The verdict form did not require the jury to specify which of Smalley's claimed medical expenses it found unrecoverable as damages.

The trial court thereafter entered judgment on the special verdict.

*Smalley's new trial motion*

Smalley moved for new trial, based partly on the trial court's refusal to permit him to show he had paid his own medical bills. The trial court denied the motion, stating as relevant: "The Court determines that it properly excluded evidence that plaintiff had personally paid his medical bills. Plaintiff sought to admit such evidence to support his argument that he would not have incurred unnecessary medical expenses in anticipation of litigation since he had to pay those bills himself. Such evidence that plaintiff paid the bills, himself, also supports the contrary position. Further, plaintiff is not competent to testify as to what medical services and billings are in fact reasonable and necessary. The evidence is marginally probative of the issue for which it was offered, and, thus, its probative value was substantially outweighed by the probability that its admission will [*sic*] create substantial danger of confusing the issues or of misleading the jury. Thus, the Court properly utilized an Evidence Code section 352 analysis to exclude the evidence." (Undesignated statutory references are to the Evidence Code.)

## DISCUSSION

Because the trial court relied on section 352 to exclude Smalley's proffered evidence, we review the court's ruling for abuse of discretion. (*Gouskos v. Aptos Village Garage, Inc.* (2001) 94 Cal.App.4th 754, 762 [114 Cal.Rptr.2d 558].) Smalley contends the court abused its discretion because neither the reasons offered by defendants on their motion to exclude the evidence nor those relied on by the court in its order denying new trial could justify the court's ruling. We agree.

To begin with, evidence that plaintiff had paid his medical expenses was manifestly relevant to his claim for damages. "The plaintiff must show that the injured person received each medical service or supply for which a sum is claimed. A bill or request for payment is evidence of the amount of the expense, and *evidence that the bill was paid is evidence that the charge was reasonable. . . .* In some instances, on the other hand, *evidence that a medical bill was not paid may be introduced to show that the amount charged was unreasonable.* [Citation.]" (Wiss & Peyrat, Cal. Tort Damages (Cont.Ed.Bar 2d ed. 2004) § 1.20, p. 20, italics added.) There is no more acceptable form of proof that medical bills were paid than evidence that plaintiff, in fact, paid them.

The collateral source rule, which defendants and the trial court relied on, is inapposite. That rule bars evidence that a plaintiff's medical expenses have been paid *by insurance*, on the ground that "such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6 [84 Cal.Rptr. 173, 465 P.2d 61].) The rule "expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. . . . Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." (*Id.* at p. 10.) Furthermore, the plaintiff does not obtain a double recovery because insurance policies normally provide for subrogation or refund of benefits after a recovery in tort. (*Id.* at pp. 10–11.)

■ Where the plaintiff has paid his own medical bills, these considerations are irrelevant. Contrary to defendants' position, it is not "consistent with the collateral source rule" to prevent the plaintiff from showing that his medical expenses have *not* been compensated by any third party. Nor does the exclusion of such evidence further any policy judgment that people should buy insurance. On the contrary, it could punish insured plaintiffs whose policies had failed to cover their medical expenses by depriving them of the chance to prove their full damages. In short, the trial court stood the collateral source rule on its head.

■ So far as the trial court found (whether or not in reliance on defendants' "collateral source rule" argument) that the evidence at issue would be unduly prejudicial to defendants, that finding is untenable. Undue prejudice under section 352 occurs when the jury is emotionally inflamed against a party without regard to the issues in the case. (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009 [62 Cal.Rptr.2d 164].) It does not occur merely because evidence is admitted that might hurt a party's case. (*Ibid.*) It was not irrelevant to the case that plaintiff had paid medical expenses that were as yet uncompensated, and such evidence did not run the risk of emotionally inflaming the jury against defendants on any immaterial point. The jury could have heard that evidence and still decided, as it did, that some of plaintiff's expenses were uncompensable.

In denying plaintiff's new trial motion, the trial court stated that plaintiff had argued his payment of his own bills proved he would not have incurred unnecessary expenses in anticipation of litigation, but this evidence "also supports the contrary position." The trial court did not explain this conclusion,

and we do not understand it. A reasonable person is unlikely to run up thousands of dollars in medical bills and pay them out of pocket on the mere gamble that he might someday obtain reimbursement from a tortfeasor.

The trial court further stated that plaintiff was not competent to testify to what medical services and billings were reasonable or necessary. However, plaintiff did not propose to present medical evidence. He simply proposed to testify that he had paid for the services he obtained. We have already explained that the fact that medical bills had been paid was relevant to prove their reasonableness.

The trial court found that the proposed evidence was "marginally probative of the issue for which it was offered." However, the court failed to specify what that issue was.

 Finally, the trial court found that the evidence raised a substantial danger of confusing the issues or misleading the jury. But this mere recital of the provisions of section 352, unsupported by specifics, adds nothing to the court's ruling.

Thus, the trial court's exclusion of plaintiff's evidence under section 352 was unsupported by any cogent reasoning or authority.[8] Furthermore, the court overlooked the other side of the coin. Dr. Cranston was allowed to testify for defendants that because plaintiff's continued treatments were objectively unnecessary his continued complaints of pain raised "a red flag," and to agree with plaintiff's counsel's hypothetical suggestion that those complaints might be prompted by "self-interest . . . for monetary gain"—unmistakably implying that plaintiff was a malingerer (though Dr. Cranston rejected the actual word as "pejorative"). But plaintiff was not permitted to rebut this insinuation by showing that he had paid the full cost of his treatment to date without any reimbursement or any certainty that he would ever be reimbursed. The consequences of the exclusion of plaintiff's evidence, in light of Dr. Cranston's testimony and the remainder of the evidence, were unduly prejudicial to plaintiff.

---

[8] At oral argument, defendant argued that the jury might be prejudiced by evidence of plaintiff's personal payment of medical expenses because they might be unduly sympathetic to one who does not have medical insurance. There are several problems with this argument. This ground of prejudice was not tendered in the trial court by defendant nor relied upon by the trial court in its ruling under section 352. But, more fundamentally, the "sympathy" for one who does not have medical insurance is the mindset that is the very aim of the collateral source rule. We *want* the jurors to assume a plaintiff does not have medical insurance. Evidence that tends to reinforce this mindset cannot be prejudicial within the meaning of section 352.

An exception to the collateral source rule (permitting evidence that expenses were paid by insurance) exists under section 352 where a defendant offers evidence of collateral payments to prove malingering and the evidence has substantial probative value for that purpose in light of all relevant facts in the case. (*Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 733 [94 Cal.Rptr. 623, 484 P.2d 599]; see *Acosta v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 19, 26 [84 Cal.Rptr. 184, 465 P.2d 72].) By parity of reasoning, it should be possible under section 352 for a plaintiff to rebut an anticipated claim of malingering by showing that he has *not* received collateral payments, but has shouldered his own expenses, which he is not certain to collect in a lawsuit. And in this case, where the defense expert was allowed to speculate that plaintiff was padding his expenses in hopes of "monetary gain" for nonexistent injuries, it was seriously damaging to plaintiff that he could not show he had lost more already by continuing treatment than he would have by discontinuing it. The trial court abused its discretion in preventing plaintiff from proving he had paid his medical expenses. (See *O'Mary v. Mitsubishi* (1997) 59 Cal.App.4th 563, 574–576 [69 Cal.Rptr.2d 389].)

Moreover, the error was prejudicial. This was a case where defendant admitted liability. Nonetheless, the jury awarded plaintiff a total of $15,000 for "[p]ast economic loss, including medical expenses." This was barely more than half the amount of his medical expenses. Even if we subtract from plaintiff's expenses ($29,409.58) the amounts paid for the contested repair of his hernia ($8,380.75),[9] the jury awarded plaintiff some $6,000 less than his actual medical expenses, not counting the hernia.

Under all the circumstances, defendants' unrebutted insinuation of malingering could have persuaded the jury to award plaintiff low medical damages. The trial court's erroneous ruling on the motion in limine, precluding plaintiff from showing he had personally paid his medical expenses, constituted a miscarriage of justice. It is reasonably probable that if the jury had heard plaintiff paid his own medical bills, it would have returned a verdict more favorable to him. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Therefore we must reverse the judgment.

---

[9] See footnote 7, *ante.* Even allocating all of plaintiff's prescription expenses to the hernia, the hernia expenses were:

| | |
|---|---|
| Hernia surgeon | $1,683.00 |
| Anesthesiologist | 800.00 |
| Hospital operation | 4,752.50 |
| Prescriptions | 1,145.25 |
| | |
| TOTAL | $8,380.75 |

## DISPOSITION

The judgment is reversed. Plaintiff shall receive his costs on appeal. (Cal. Rules of Court, rule 27(a).)

Blease, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied May 12, 2005, and respondents' petition for review by the Supreme Court was denied July 13, 2005. George, C. J., did not participate therein.