187 Cal.App.4th 313 (2010)
113 Cal. Rptr. 3d 742
MICHAEL KING, Plaintiff and Appellant,
v.
CAROL WILLMETT, Defendant and Respondent.
No. C059236.
Court of Appeals of California, Third District.
August 9, 2010.
As modified August 24, 2010.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*316 Walker, Hamilton & Koenig, Walter H. Walker III; Hinton, Alfert & Sumner, Scott H.Z. Sumner and Jeremy Lateiner for Plaintiff and Appellant.
Hinton, Alfert & Sumner, Scott H.Z. Sumner and Jeremy Lateiner for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.
Mayall, Hurley, Knutsen, Smith & Green, Mark E. Berry and Jesmin Alam for Defendant and Respondent.

OPINION
CANTIL-SAKAUYE, J.
In this case we primarily consider whether, in a negligence action against a nonpublic defendant, the reduction of a plaintiff's award of past medical expense damages to the dollar amount ultimately paid by the plaintiff's private health insurance to his health care providers is appropriate under the collateral source rule. In light of the public policy conclusions expressed by our state Supreme Court and the Legislature's enactment of specific statutes governing the operation of the collateral source rule in limited kinds of cases, we conclude reduction is inappropriate in this case. Therefore, the trial court erred in reducing the award here.[1]
In the unpublished portion of this opinion, we reject plaintiff's other contentions of reversible error.
We shall reverse the amended judgment on verdict and remand the matter to the trial court with directions to reinstate the jury's award of past medical expense damages and enter a new judgment in favor of plaintiff with interest and costs consistent with such award.

BACKGROUND
Plaintiff Michael King, an insurance defense attorney employed as the managing attorney for the Sacramento legal office for Farmers Insurance, was driving south on Highway 99 on the evening of August 27, 2004, when he was rear-ended by defendant Carol Willmett. According to plaintiff, he was *317 hit three times. Plaintiff got out of his car and went back to defendant's car where he spoke with defendant. Defendant admitted responsibility for the accident several times and, at plaintiff's urging, wrote a note stating: "I, Carol J. Willmett, take responsibility for rear-ending an 03 Bonneville driven by Mike King on 8/27/04 approximately 7:40 pm, south bound on Hwy 99, just north of Morada Lane in Stockton, CA. s/Carol J. Willmett."
After the accident, plaintiff drove his damaged car to a Farmers Insurance claims office and then to a body shop. He rented a car intending to continue his drive south, but he turned around after 10 miles or so because he was feeling pain and stiffness in his neck and shoulders. He did not go to the hospital, but went home where he rested, took over-the-counter pain medication, and used icepacks over the course of the weekend. Plaintiff went to see his primary care physician a few days later when he continued to feel sore. He was prescribed medication and massage therapy. Plaintiff also obtained chiropractic treatment over the course of the next couple of months, which according to plaintiff, would be effective for a few days but did not resolve the problem. Plaintiff's chiropractor testified plaintiff did not complain of any numbness, tingling or radiating pain.
When plaintiff had a trial in Shasta County in late November through December 2004, his symptoms flared up under the stress of his work. Rest over the Christmas holiday helped, but did not eliminate, his pain.
Plaintiff returned to his chiropractor in January 2005 because of his ongoing symptoms. He described his level of pain at this time as a two on a scale of 10, which was down from his initially reported level of six. He still had no weakness, numbness, tingling or radiating pain. His chiropractor felt plaintiff's prognosis was good and released him from treatment.
In February 2005, plaintiff drove to Los Angeles to attend a meeting. During the drive and after he arrived, plaintiff began to have tingling and numbness in his left upper back and into his left upper arm. Plaintiff went back to his chiropractor in March 2005 and reported these symptoms. The chiropractor suspected possible neurological involvement.
Plaintiff decided to see a neurologist or neurosurgeon and a colleague recommended Dr. Laura Anderson. Plaintiff went to see Dr. Anderson in July 2005. She recommended he have cervical spine X-rays and an MRI. After obtaining those tests in October 2005, plaintiff returned to Dr. Anderson in December 2005 for evaluation and diagnosis. She told plaintiff he had nerve root impingement at the C6-7 disk level on the left and recommended physical therapy and yoga, which plaintiff undertook.
*318 In early 2006, plaintiff decided to move back to Santa Rosa where he could manage the smaller Santa Rosa legal office. Plaintiff felt the move was necessary because of a decline in his stamina. Plaintiff was referred to a new neurosurgeon, Dr. Samir Lapsiwala, whom he saw beginning in October 2006. Dr. Lapsiwala diagnosed plaintiff with degenerative disk disease and recommended continuing conservative treatment with physical therapy. If plaintiff continued to show weakness, plaintiff would be a candidate for a surgical three-level fusion.
As part of this action against defendant, plaintiff was seen in March 2007 by neurosurgeon Edward F. Eyster for an independent medical evaluation. According to Dr. Eyster, plaintiff's October 2005 MRI showed extensive degenerative damage at most levels of plaintiff's spine, but it was worst at three specific disk levels. By the time Dr. Eyster saw plaintiff, plaintiff was losing function in the C7 nerve root. Dr. Eyster thought plaintiff was a surgical candidate because of the progressive weakness in his left arm and warned plaintiff of the risks of delaying surgery. Dr. Eyster advised electrical studies, new X-rays and a repeated MRI to determine the appropriate surgical intervention, but believed it was most likely plaintiff would "need a one or two level anterior cervical discectomy and fusion."
It was Dr. Eyster's opinion that the 2004 accident aggravated plaintiff's preexisting asymptomatic condition of degenerative cervical disk disease. In deposition testimony played at trial, Dr. Eyster explained that when he looked at causation, there were three relevant events in his mind. "The number one was the motor vehicle accident, which started the process. I think there was a second event in December, with excessive fatigue and workload. The degenerative process was preexisting. This has been going on for years. And then the event in February, the third event, when the disk actually ruptured, was off the long drive." Dr. Eyster testified he did not know what happened in February, but something new did happen to cause additional aggravation resulting in the need for surgery.
Plaintiff saw another neurosurgeon, Dr. Eldan Eichbaum, for a second opinion on the appropriate surgical treatment. Dr. Eichbaum recommended surgery at the two most affected disk levels. He felt it was possible plaintiff would improve after such surgery, but if his symptoms persisted, a second surgery could be performed to address the third disk level.
In January 2008, plaintiff underwent a successful two-level anterior cervical discectomy and fusion surgery performed by Dr. Lapsiwala. The surgery had two purposesto relieve the irritation of the nerve causing the radicular *319 pain and to stabilize the spine to help with the neck pain. Plaintiff was pleased with the results of his surgery and showed significant improvement in his symptoms. Plaintiff did not, however, feel completely cured by the surgery. Dr. Lapsiwala opined that the continued tingling in the small finger of plaintiff's left hand indicated irritation of the nerve not addressed by the surgery. When asked on direct examination if he had an opinion to a reasonable degree of medical probability whether it is more likely than not that plaintiff will have to have a second surgery, Dr. Lapsiwala said he believed "at some point" plaintiff will require the third level to be addressed by surgery. On cross-examination, however, Dr. Lapsiwala testified it was best to wait on the C8 nerve root to give plaintiff time to recover from the first surgery and to see what happens, to possibly avoid the second surgery. He admitted a future surgery was not 100 percent definite and agreed that a recommendation for a second surgery would be highly speculative without knowing what plaintiff's recovery would be from the first surgery. All he could give plaintiff was the chances that surgery would be needed or not. He could not be sure one way or the other.
Dr. Lapsiwala released plaintiff to return to work without restrictions on February 15, 2008. He saw no medical reason plaintiff could not go back to his regular and customary work. Plaintiff returned to work and tried to resume his usual workload, but was unable to perform his full duties. He started looking into early retirement, although he admitted no doctor had told him medically he should retire. At the time of trial, plaintiff testified he planned to take early retirement in a few months, but acknowledged he had not submitted any paperwork to initiate his retirement.
The defense called Dr. William Hoddick, a physician specializing in diagnostic radiology and medical imaging, to testify regarding his review of plaintiff's medical imaging studies. He testified plaintiff's October 2005 MRI exam showed only age-related degenerative damage. He testified he found no evidence of trauma on the MRI. The same was true of plaintiff's abdominal ultrasound examination in September 2005, plaintiff's radiography of the cervical spine in December 2006 and plaintiff's MRI of the cervical spine in April 2007. The exams showed no injury he could relate back to the 2004 auto accident. On cross-examination, Dr. Hoddick testified that nothing he reviewed indicated plaintiff's degenerative disk disease was aggravated by the accident. In his deposition, Dr. Hoddick admitted he could not say to a reasonable degree of medical certainty that plaintiff's disease was not aggravated by the accident. He could not say one way or the other. Plaintiff's diagnostic radiologist disputed Dr. Hoddick's opinion at trial that plaintiff's imaging studies did not show evidence of trauma.
*320 By way of a special verdict, the jury found defendant negligent, that her negligence was a substantial factor in causing harm to plaintiff and that plaintiff sustained damages in the amount of $169,499.94 for past medical expenses, $20,000 for past wage loss, $75,000 for past noneconomic damages, $0 for future medical expenses, $0 for future wage loss, $0 for future loss of pension, $0 for future loss of bonus, $0 for future loss of company car, and $50,000 for future noneconomic damages, for a total jury award of $314,499.94.
After hearing legal argument, the trial court granted defendant's posttrial motion for reduction of medical billings and reduced the amount of past medical expense damages to $76,286.32 for a final amended judgment amount of $221,286.32.[2]
The trial court denied plaintiff's motion for attorney fees under Code of Civil Procedure section 2033.420 and plaintiff's motion for new trial or, in the alternative, request for additur.

DISCUSSION

I.

APPLICATION OF THE COLLATERAL SOURCE RULE
Before we discuss this rule, a few prefatory statutes are in order. Civil Code section 3281 provides that, "[e]very person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." (Italics added.) The standard measure of tort damages is "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333.) "Detriment is a loss or harm suffered in person or property." (Civ. Code, § 3282.) Economic damages in a personal injury action "means objectively verifiable monetary losses including medical expenses." (Civ. Code, § 1431.2, subd. (b)(1).)
(1) In determining such damages, the doctrine known as the "collateral source rule" provides "that if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (Helfend v. Southern Cal. Rapid Transit *321 Dist. (1970) 2 Cal.3d 1, 6 [84 Cal.Rptr. 173, 465 P.2d 61] (Helfend).) As a matter of common law, California has adopted the collateral source rule, which includes the closely related principle that, "jurors should not be told that the plaintiff can recover compensation from a collateral source." (Lund v. San Joaquin Valley Railroad (2003) 31 Cal.4th 1, 9-10 [1 Cal.Rptr.3d 412, 71 P.3d 770] (Lund); see Hrnjak v. Graymar, Inc. (1971) 4 Cal.3d 725, 729-730 [94 Cal.Rptr. 623, 484 P.2d 599] (Hrnjak); Helfend, supra, at p. 6; Smock v. State of California (2006) 138 Cal.App.4th 883, 886-887 [41 Cal.Rptr.3d 857] (Smock).) Thus, the collateral source rule as expressed by case law has two components: an evidentiary rule that limits what the jury is told about plaintiff's receipt of collateral source compensation, and a substantive rule that prohibits reduction of the damages plaintiff would otherwise receive for plaintiff's receipt of collateral source compensation. (Arambula v. Wells (1999) 72 Cal.App.4th 1006, 1015 [85 Cal.Rptr.2d 584] (Arambula).)
This case involves the application of the substantive rule. Plaintiff contends the trial court violated the collateral source rule by reducing the jury's award of past medical expense damages from the amount billed by plaintiff's health care providers to the cash amount paid by plaintiff's private health insurance that was accepted by the providers as payment in full.[3] Whether the trial court correctly applied the collateral source rule here is a question of law that we independently review. (See Souza v. Westlands Water Dist. (2006) 135 Cal.App.4th 879, 891 [38 Cal.Rptr.3d 78] [when the issue is presented on the basis of undisputed facts and only a question of the application of the law to those facts need be answered, our review is de novo].)

A. Plaintiff Did Not Waive His Claims

Defendant claims plaintiff stipulated to the postverdict procedure used by the trial court to address defendant's claims regarding reduction of the award of past medical expense damages and to the specific amounts claimed as reductions. Therefore, according to defendant, plaintiff waived any challenge to the trial court's reduction of the jury's award of medical expense damages. We disagree.
The record shows that both plaintiff and defendant filed pretrial motions in limine dealing with the issues surrounding the application of the collateral source rule to plaintiff's past medical expenses. The trial court ruled it would not permit evidence to be presented before the jury of any collateral source *322 payments, including health insurance payments. It reserved consideration of the reduction of any jury award for past medical expenses until after the verdict, consistent with Greer, supra, 141 Cal.App.4th 1150. The court told defendant her right to a postverdict motion was preserved and that counsel could argue whatever was appropriate at that time.
Defense counsel then represented to the trial court that the parties had agreed "that the reimbursed amounts that have been tabulated by the defendant for purposes of [her] post-trial motion are authenticated and otherwise will not be objected to as bills by ... plaintiff." The trial court clarified the nature of the agreement, indicating its understanding that defendant was not going to make plaintiff call a witness to "testify that each and every item on that bill was reasonable and necessary and has been properly authenticated, meaning it was ordered by a doctor or was necessary to the treatment and care of [plaintiff]. In exchange for which, [plaintiff was] not going to challenge [defendant's] rendition of the fact that X amount was actually paid on a particular bill in satisfaction of that bill." Plaintiff noted that in addition to what the insurance companies may have actually paid, he may have paid additional amounts out of his pocket. Defendant agreed there were certain "co-pays that were paid," which were included in the tabulation. Plaintiff again clarified the agreement as follows: "So we don't have to bring in any of these outside people to say, yes, these are my bills and these are the reasonable amounts. That's fine on both sides, going both ways. [¶] We have some legal arguments, of course, at the end of the case on Greere [sic] and so forth. But I'm not going to challenge his numbers and make him bring in a witness to testify as to, yes, indeed, these were the actual amounts we received." (Italics added.) The court responded: "Okay. Legal arguments are fine. We have that agreement." (Italics added.)
The parties subsequently agreed the amount of plaintiff's medical bills totaled $169,499.94. They agreed the amount paid by plaintiff's private health maintenance organization (HMO) and plaintiff through his "co-pays," which plaintiff's medical providers accepted as full payment for their services, was $76,286.32.
We view this record as showing an agreement by the parties to save their respective arguments on the collateral source rule until after the jury returned its verdict. It shows the parties agreed to limit their arguments to their legal positions and not to challenge how plaintiff arrived at the monetary figures underlying each of their legal positions. The record does not show plaintiff waived his contention that the collateral source rule prohibits the reduction of *323 the jury's award of medical expense damages. We turn to the merits of that claim.

B. The Trial Court Erred in Reducing the Jury's Award of Damages for Past Medical Expenses

(1) The California Supreme Court Has Declared the Public Policy Interests in Favor of the Collateral Source Rule

In Helfend, supra, 2 Cal.3d 1, the California Supreme Court described the collateral source rule as "embod[ying] the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift. The tortfeasor should not garner the benefits of his victim's providence." (Id. at pp. 9-10, fn. omitted.) "The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." (Id. at p. 10.)
The California Supreme Court in Helfend concluded a number of public policy interests justified the continuation of the collateral source rule (Helfend, supra, 2 Cal.3d at pp. 10-14) despite criticism that the rule provides a plaintiff with a "`double recovery'" and "defeats the principle that damages should compensate the victim but not punish the tortfeasor." (Id. at p. 10; see Smock, supra, 138 Cal.App.4th at p. 887.) The Supreme Court first questioned whether there would be any true double recovery where the payor has a right of subrogation or reimbursement (Helfend, supra, at pp. 10-11), but went on to conclude that even when subrogation or reimbursement is inapplicable, the collateral source rule "performs entirely necessary functions in the computation of damages." (Id. at p. 11.) Since the cost of medical care is often an important indicator of plaintiff's general damages, the rule prevents a defendant from upsetting "the complex, delicate, and somewhat indefinable calculations" of the jury with evidence that the plaintiff has been recompensed by a collateral source for his medical costs. (Id. at pp. 11-12.) The rule also partially serves to compensate the plaintiff for the portion of the award that the plaintiff's attorney typically receives as a contingent fee, *324 making the award "a somewhat closer approximation to full compensation for [plaintiff's] injuries." (Id. at pp. 12-13; accord, Arambula, supra, 72 Cal.App.4th at pp. 1009-1010, fn. 1.) Quoting from commentary with apparent approval, the Supreme Court noted, "`the rule seems to perform a needed function. At the very least, it removes some complex issues from the trial scene. At its best, in some cases, it operates as an instrument of what most of us would be willing to call justice.' [Citation.]" (Helfend, supra, at p. 7, fn. 6.)
Essentially, application of the collateral source rule as expressed by our Supreme Court represents its policy choice in the calculation of tort damages to permit the victim to retain a benefit where necessary, rather than to confer a benefit on the tortfeasor. (Helfend, supra, 2 Cal.3d at p. 10; Smock, supra, 138 Cal.App.4th at p. 888.)[4]

(2) The California Legislature Has Modified the Application of the Collateral Source Rule in Two Limited Situations

The Legislature has abrogated the application of the collateral source rule through the provisions of Civil Code section 3333.1 (section 3333.1) in actions for professional negligence against health care providers. Section 3333.1 provides a defendant with an election to introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to, among other things, "any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services." (§ 3333.1, subd. (a).) If the defendant elects to introduce such evidence, the plaintiff may in turn introduce evidence of any amount which the plaintiff has paid to secure the insurance benefits introduced by the defendant. (Ibid.) Section 3333.1 further provides that, "[n]o source of collateral benefits introduced pursuant to subdivision (a) shall recover any amount against the plaintiff nor shall it be subrogated to the rights of the plaintiff against a defendant." (§ 3333.1, subd. (b).)
The effect of this statute is to authorize a defendant health care provider in a medical malpractice case to introduce evidence to support a lower award of damages, but to allow a plaintiff to offset that evidence with proof of the cost *325 of obtaining the introduced insurance benefits. Where the defendant has made this election to introduce collateral source evidence, the statute, in apparent contemplation of a potentially reduced award, allows the plaintiff to keep any medical expense damage award. The plaintiff does not have to turn it over to his/her insurer despite the insurer's payment of the plaintiff's medical costs and otherwise applicable subrogation rights.
In Government Code section 985 (section 985), the Legislature has addressed the application of the collateral source rule to public defendants in personal injury or wrongful death actions. Section 985 retains the evidentiary portion of the collateral source rule by expressly prohibiting the introduction of any evidence of collateral source payments at trial. (§ 985, subd. (b).) "However, after a verdict has been returned against a public entity that includes damages for which payment from a collateral source ... has already been paid or is obligated to be paid for services or benefits that were provided prior to the commencement of trial, and the total [exceeds a specified amount], the defendant public entity may, by a motion noticed within the time set in Section 659 of the Code of Civil Procedure, request a posttrial hearing for a reduction of the judgment against the defendant public entity for collateral source payments paid or obligated to be paid for services or benefits that were provided prior to the commencement of trial." (Ibid., italics added.)
Section 985 further provides that at any such hearing, the trial court "shall, in its discretion and on terms as may be just, make a final determination as to any pending lien and subrogation rights, and, subject to subdivisions (1) to (3), inclusive, determine what portion of collateral source payments should be reimbursed from the judgment to the provider of a collateral source payment, deducted from the verdict, or accrue to the benefit of the plaintiff." (§ 985, subd. (f), italics added.)[5] Subdivision (g) of section 985 provides, however, that "[i]n no event shall the total dollar amount deducted from the verdict, paid to lienholders or reimbursed to all collateral source providers, exceed one-half of the plaintiff's net recovery for all damages after deducting for attorney's fees, medical services paid by the plaintiff, and litigation costs; however, the court may order no reimbursement or verdict reduction if the reimbursement or reduction would result in undue financial hardship upon the person who suffered the injury."
*326 (2) Section 3333.1 and section 985 represent the Legislature's specification of two exceptions to the normal application of the collateral source rule. As can be seen, the Legislature has carefully delineated how the rule is changed and how it should operate in these two limited areas. The existence and nature of these exceptions to the collateral source rule strongly suggest that normally under the collateral source rule the trial court should not reduce a jury's award of damages to reflect collateral source payments. (3) "`Under the familiar rule of construction, expressio unius est exclusio alterius, where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed.'" (Mutual Life Ins. Co. v. City of Los Angeles (1990) 50 Cal.3d 402, 410 [267 Cal.Rptr. 589, 787 P.2d 996]; see also Imperial Merchant Services, Inc. v. Hunt (2009) 47 Cal.4th 381, 389-390 [97 Cal.Rptr.3d 464, 212 P.3d 736].)
Moreover, a strange anomaly presents itself if the collateral source rule is construed to require the reduction of an award of medical expense benefits to the dollar amount paid by a plaintiff's private insurance. The medical expense damages of a plaintiff suing a private defendant would be limited as a matter of law to the amount ultimately paid by the plaintiff's insurer to the plaintiff's health care providers, but a plaintiff suing a public defendant for personal injury or wrongful death may or may not be subject to any reduction of damages in the discretion of the trial court under section 985. Thus, the public defendant would not be assured of a reduced award, but a private defendant would be. It is seriously questionable whether the Legislature intended such a result.
It is in the context of these statutes and the public policy interests expressed by our Supreme Court that we turn to a review of the case law relied on by the trial court here to reduce the jury's award of past medical expense damages.

(3) Hanif, Nishihama, and Greer

In 1988 this court decided the case of Hanif, supra, 200 Cal.App.3d 635. Hanif involved a personal injury action arising out of an accident in which a seven-year-old child was struck by an automobile on the property of the defendant public housing authority. (Id. at p. 637.) Over the defendant's objection, the plaintiff introduced evidence that the "`reasonable value'" of the medical services rendered to the plaintiff was the amount the medical providers billed to Medi-Cal, even though Medi-Cal paid considerably less and the hospital had "`written off'" the difference. (Id. at pp. 639, 644.) The trial court awarded the plaintiff the reasonable value of the medical services as special damages. (Ibid.) The defendant appealed, contending the trial court *327 should have limited the minor's recovery for past medical services to the amount actually paid by Medi-Cal. (Id. at p. 639.) This court agreed. (Id. at pp. 643-644.)
Preliminarily, it was undisputed the minor was entitled under the collateral source rule to recover from the defendant, as special damages, the amount Medi-Cal paid. (Hanif, supra, 200 Cal.App.3d at pp. 639-640.) However, under fundamental principles underlying the recovery of compensatory damages in tort actions, a plaintiff was not entitled to recover from a tortfeasor "more than the actual amount he paid or for which he incurred liability for past medical care and services." (Id. at p. 640.) "[W]hen the evidence shows a sum certain to have been paid or incurred for past medical care and services, whether by the plaintiff or by an independent source, that sum certain is the most the plaintiff may recover for that care despite the fact it may have been less than the prevailing market rate." (Id. at p. 641.) Hanif found this rule to be consistent with the notion "that a plaintiff is entitled to recover up to, and no more than, the actual amount expended or incurred for past medical services so long as that amount is reasonable." (Id. at p. 643.)
As the plaintiff in Hanif was covered by Medi-Cal, this court had no occasion in that case to address the issue of whether a plaintiff in a personal injury action who has private health care insurance may recover, under the collateral source rule, economic damages for the amount reasonably billed by his/her health care providers even though it exceeds the dollar amount the insurers actually paid and which the providers accepted as full payment for the rendered medical services.
In Parnell v. Adventist Health System/West (2005) 35 Cal.4th 595 [26 Cal.Rptr.3d 569, 109 P.3d 69], a decision involving a hospital's lien rights under California's Hospital Lien Act (HLA) (Civ. Code, §§ 3045.1-3045.6), the California Supreme Court noted "we do not reach, and express no opinion on," whether Hanif (and an earlier Supreme Court opinionOlszewski v. Scripps Health (2003) 30 Cal.4th 798 [135 Cal.Rptr.2d 1, 69 P.3d 927]) "apply outside the Medicaid context and limit a patient's tort recovery for medical expenses to the amount actually paid by the patient notwithstanding the collateral source rule." (Parnell, at pp. 611-612, fn. 16.)
In Nishihama v. City and County of San Francisco (2001) 93 Cal.App.4th 298 [112 Cal.Rptr.2d 861], the plaintiff was injured when she tripped and fell in a pothole in a crosswalk maintained by the defendant city. (Id. at p. 301, declined to follow as stated in Yanez v. SOMA Environmental Engineering, Inc. (2010) 185 Cal.App.4th 1313, 1327 [111 Cal.Rptr.3d 257].) The jury *328 awarded the plaintiff damages for her past medical care expenses based on the normal rates of the medical center that provided the plaintiff the services. (Nishihama, supra, at p. 306.) The plaintiff, however, participated in an employer-sponsored health plan administered by Blue Cross that had a contract with the medical center under which the medical center accepted a reduced rate as payment in full. (Id. at pp. 306-307.) The defendant city appealed, arguing the award for the medical services should have been the sum accepted by the medical center, not the medical center's normal rates. (Ibid.) The plaintiff responded that because the medical center had filed a lien against her recovery under the HLA, she should not be put in the position of having to accept the lesser amount that Blue Cross paid while risking the possibility of having to pay the greater amount to the medical center because of its lien. (Nishihama, at pp. 306-307.) The appellate court found the medical center's lien right did not extend beyond the amount it agreed to receive from Blue Cross as payment in full. As the medical center had been paid that amount, it had no lien rights in the damages awarded to the plaintiff, "and the court, therefore, erred in permitting the jury to award plaintiff an amount in excess of [the amount paid] for the services provided by [the medical center]." (Ibid.)
(4) The issue in Nishihama, supra, 93 Cal.App.4th 298, was the validity of the medical center's lien. The court did not discuss the application of the collateral source rule. And although the case involved payments made by the plaintiff's private insurance, it was brought against a public defendant, which as we have discussed, could have brought a postverdict motion for reduction under section 985, an express exception to the general collateral source rule. Cases are not authority for propositions they did not consider. (Santisas v. Goodin (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399]; People v. Scheid (1997) 16 Cal.4th 1, 17 [65 Cal.Rptr.2d 348, 939 P.2d 748].)
Nevertheless, after the publication of Nishihama, the defense bar began claiming Hanif and Nishihama required the limitation of tort special damages to the cash payments made by private health insurers. Plaintiffs' bar argued against such a rule.[6]
We next consider Greer, a case touching on the issue. (Greer, supra, 141 Cal.App.4th 1150.) In Greer, the defendant brought a motion in limine to prevent the jury from receiving evidence of medical expenses that exceeded *329 the amount paid to medical providers on the plaintiff's behalf, relying on Hanif, supra, 200 Cal.App.3d 635 and Nishihama, supra, 93 Cal.App.4th 298. (Greer, at p. 1154.) The trial court denied the motion with the proviso that if the amount of medical expenses awarded exceeded the amount paid, it would entertain a motion for reduction. (Ibid.) After the verdict was entered and the jury discharged, the defendant filed a motion for new trial or, in the alternative, a motion for judgment notwithstanding the verdict, but did not file a motion for reduction. (Id. at pp. 1154-1155.) The trial court stated it would have entertained a motion for reduction, but wondered how the motion would work in practice since the special verdict form did not list medical expenses as a separate item. (Ibid.)
On appeal, this court upheld the trial court's ruling on the defendant's motion in limine. (Greer, supra, 141 Cal.App.4th at p. 1157.) It also upheld the award of damages, finding the defendant had forfeited his various claims of error regarding the trial court's failure to order a reduction of the medical services award by failing to request a verdict form containing a separate entry for the plaintiff's past medical expenses. (Id. at pp. 1157-1158.)
(5) As the defendant's claims in Greer were forfeited, this court was not called on to consider whether the trial court's proposed postverdict motion procedure was appropriate or whether a reduction would have been required. To the extent there is language in the opinion suggesting a resolution of such issues, it must be considered dicta. "An appellate decision is not authority for everything said in the court's opinion but only `for the points actually involved and actually decided.'" (Santisas v. Goodin, supra, 17 Cal.4th at p. 620.)
We conclude Hanif, Nishihama and Greer do not provide governing authority for the question directly presented in this case.

(4) The Trial Court Violated the Collateral Source Rule by Reducing the Jury's Award of Past Medical Expense Damages to the Cash Amount Paid by Plaintiff's HMO

(6) "An injured plaintiff in a tort action cannot recover more than the amount of medical expenses he or she paid or incurred, even if the reasonable value of those services might be a greater sum." (Katiuzhinsky v. Perry (2007) 152 Cal.App.4th 1288, 1290 [62 Cal.Rptr.3d 309], italics added.)
Patients who receive medical services incur liability for the cost of such services. (See Holmes v. California State Auto. Assn. (1982) 135 Cal.App.3d 635, 638-639 [185 Cal.Rptr. 521].) In the absence of other applicable *330 contractual agreements, statutory provisions or charity, they will be billed for the services. The parties here stipulated plaintiff's medical bills totaled $169,499.94. Defendant agreed there would be no challenge to the numbers composing that total as reasonable amounts. Thus, it was agreed plaintiff was billed for the rendered medical services in a reasonable amount. We see no basis in the record from which we could conclude plaintiff did not "incur" $169,499.94 in past medical expenses.
Of course, it was also undisputed that plaintiff's medical providers accepted $76,286.32 as full payment for their services.
(7) We conclude, however, that the collateral source rule precludes the reduction of the amount of medical expenses plaintiff incurred ($169,499.94) for the rendered services to the cash amount ($76,286.32) accepted by plaintiff's medical providers.
(8) The collateral source rule was adopted based on recognition that "a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift. The tortfeasor should not garner the benefits of his victim's providence." (Helfend, supra, 2 Cal.3d at pp. 9-10, fn. omitted.) Our Supreme Court has adopted the collateral source rule (Lund, supra, 31 Cal.4th at pp. 9-10; Hrnjak, supra, 4 Cal.3d at pp. 729-730; Helfend, supra, at p. 6), expressing the public policy judgment that a tortfeasor should not be allowed to mitigate damages based on the fortuitous circumstance that the plaintiff is covered by insurance. (Helfend, supra, at p. 10.) The Supreme Court has concluded the public policy interests in favor of the rule justify its continuation despite the possibility that it results in some cases in overcompensation of the plaintiff. (Id. at pp. 10-14.) The Supreme Court has expressly recognized that even in circumstances where subrogation or reimbursement is inapplicable, the collateral source rule performs a needed and appropriate function. (Id. at pp. 11-13.) The collateral source rule reflects a policy choice in the calculation of tort damages that permits a victim to retain a benefit, rather than to confer a benefit on the tortfeasor. (Helfend, supra, at p. 10; Smock, supra, 138 Cal.App.4th at p. 888.)
The Legislature has seen fit to alter the collateral source rule in two limited situations, neither of which is applicable here. We decline to carve out any further limitations of the rule, particularly as acceptance of the reduction imposed by the trial court here would produce a result inconsistent with the apparent rationale behind section 985.
We are guided here by Helfend and its commentary on the collateral source rule that, "at least with respect to medical insurance[,] benefits [have] become so integrated within our present [tort] system that its precipitous judicial *331 nullification would work hardship . . . [and any] proposed changes, if desirable, would be more effectively accomplished through legislative reform." (Helfend, supra, 2 Cal.3d at p. 13; see also Smock, supra, 138 Cal.App.4th at p. 888 ["If other modifications or limitations to this long-established rule are warranted, their creation is best left to the Legislature."].)
In the absence of either statutory authority or further instruction from the Supreme Court, we conclude the trial court erred in reducing the award of past medical expense damages in the jury's special verdict. We need not address plaintiff's "sub-issues" regarding the authority for and conduct of a posttrial reduction hearing.

II., III.[*]

DISPOSITION
The amended judgment on verdict is reversed and the matter is remanded to the trial court with directions to reinstate the jury's award of past medical expense damages and enter a new judgment in favor of plaintiff with interest and costs consistent with such award.
Scotland, P. J., concurred.
HULL, J., Dissenting.
I respectfully dissent.
A good deal of thoughtful analysis has come forth of late regarding the effect of the collateral source rule on the question of the compensability in negligence actions of that amount of money "written off" by health care providers who reduce their bills through agreements or negotiations between the health care provider and a health insurance carrier. (See, e.g., Olsen v. Reid (2008) 164 Cal.App.4th 200 [79 Cal.Rptr.3d 255]; Yanez v. SOMA Environmental Engineering, Inc. (2010) 185 Cal.App.4th 1313 [111 Cal.Rptr.3d 257] (Yanez).) More is yet to come given the Supreme Court's grant of review in Howell v. Hamilton Meats & Provisions, Inc. (2009) 179 Cal.App.4th 686 [101 Cal.Rptr.3d 805], review granted March 10, 2010, S179115.
In this matter, the jury found that plaintiff sustained injury for past medical expenses in the amount of $169,499.94, which was the amount originally billed by the health care providers, but that award of damages was thereafter *332 reduced by the trial court to $76,286.32, the amount plaintiff's health care insurer paid, and the health care providers accepted, as payment in full. The question is whether the plaintiff is legally entitled to the difference between the jury award and the amount actually paid, that is, $93,213.62, an amount that he technically incurred as a debt at the time the health care providers rendered their billings, but an amount which he was never in fact obligated to pay. The majority says that he is; I think that he is not.
The issue we decide today is one that courts in jurisdictions outside of California have struggled with in the last few years, reaching different conclusions supported by different analytical underpinnings. (See, e.g., Moorhead v. Crozer Chester Medical Center (2001) 564 Pa. 156 [765 A.2d 786]; Robinson v. Bates (2006) 112 Ohio St.3d 17 [2006 Ohio 6362, 857 N.E.2d 1195] (Robinson); Wills v. Foster (2008) 229 Ill.2d 393 [323 Ill.Dec. 26, 892 N.E.2d 1018] (Wills); Stanley v. Walker (Ind. 2009) 906 N.E.2d 852; Scott v. Garfield (2009) 454 Mass. 790 [912 N.E.2d 1000] and the many cases cited in those opinions.) It is an issue that has received extensive and scholarly analysis in our courts as well as can be seen from a reading of Howell and Yanez, among other appellate opinions. I will not burden the discussion much here, other than to make a few observations that lead me to think that the "written-off" amounts are not properly compensable. Happily, we will have clarity on the issue reasonably soon given the California Supreme Court's grant of review in Howell.
In California, damages and the measure of damages in a personal injury action are defined by statute. Thus, Civil Code section 3281 provides: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." Civil Code section 3333 says: "For the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby . . . ." "Detriment" is statutorily defined as "a loss or harm suffered in person or property." (Civ. Code, § 3282.) Economic damages suffered by the injured victim include the reasonable cost of medical care. (Civ. Code, § 1431.2, subd. (b)(1); Dimmick v. Alvarez (1961) 196 Cal.App.2d 211 [16 Cal.Rptr. 308]; see CACI No. 3903A.)
I have difficulty finding detriment, that is, a loss or harm suffered by plaintiff, arising from bills he did not have to pay. While some courts have found detriment in the mere fact of the original billing and a plaintiff's initial obligation to pay the bills for medical services, this detriment is, at best, evanescent under these circumstances, one soon to be extinguished by the formulas and agreements between the health care providers and the health insurance carrier.
*333 But the heart of the debate in our cases lies with the application of the collateral source rulea rule of compensation that stands as an exception to the usual requirement that damages be based on detriment in a tort action. (Robinson, supra, 857 N.E.2d at pp. 1198-1199.)
While the ancestry of the collateral source rule in California goes back much further (see Peri v. L. A. Junction Ry. (1943) 22 Cal.2d 111 [137 P.2d 441]; Loggie v. Interstate Transit Co. (1930) 108 Cal.App. 165 [291 P. 618]), modern discussions of the rule tend to begin with Helfend v. Southern Cal. Rapid Transit Dist. (1970) 2 Cal.3d 1 [84 Cal.Rptr. 173, 465 P.2d 61] (Helfend).
In Helfend, the plaintiff was injured when a rapid transit district bus hit his car. Regarding the cost of his medical care, the trial court refused to allow evidence to go before the jury that the plaintiff had received payments for his medical bills from any collateral source and decided the jury's verdict for those expenses would not be reduced by the amount of the insurance payments made by the plaintiff's health insurance carrier.
The Supreme Court affirmed the trial court's rulings. The court acknowledged that, "many other jurisdictions have restricted or repealed [the collateral source rule]," that "[i]n this country most commentators have criticized the rule and called for its early demise" (Helfend, supra, 2 Cal.3d at pp. 6-7, fns. omitted), and that, in a prior opinion (City of Salinas v. Souza & McCue Construction Co. (1967) 66 Cal.2d 217 [57 Cal.Rptr. 337, 424 P.2d 921]), the high court "took note of the academic criticism of the rule, characterized the rule as `punitive,' and held it inapplicable" in the earlier case. (Helfend, at p. 7.) Nonetheless the high court affirmed the application of the rule in the matter then before it, observing the rule "embodies the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift" and also observing that "[t]he tortfeasor should not garner the benefits of his victim's providence." (Id. at pp. 9-10.)
In Hanif v. Housing Authority (1988) 200 Cal.App.3d 635 [246 Cal.Rptr. 192] (Hanif), the plaintiff had been injured in an accident involving an automobile and sustained severe and permanent injuries. At trial, the "plaintiff introduced evidence that the `reasonable value' of the medical services rendered . . . was in excess of amounts Medi-Cal had actually paid the [medical care] providers. The trial court found the reasonable value of the physician services to have been $4,618, whereas Medi-Cal had paid only $2,823, and the reasonable value of the hospital services to have been $27,000, whereas Medi-Cal had paid only $16,494. There was no evidence, however, that plaintiff was or would become liable for the difference. And the *334 balance between the amount billed to Medi-Cal and the amount paid was `written off' by the hospital." (Id. at p. 639.) Even so, the trial court awarded the plaintiff the reasonable value of the medical services even though that amount exceeded the amounts actually paid by Medi-Cal.
This court reversed that portion of the judgment that awarded the cost of medical services to the extent those costs exceeded those amounts that Medi-Cal had actually paid. Acknowledging Helfend and the collateral source rule, the court held that the amounts paid by Medi-Cal were properly awarded to the plaintiff even though the plaintiff himself had not had to pay those amounts. (Hanif, supra, 200 Cal.App.3d at pp. 639-640.) But the court, relying on long-standing principles of tort damages, held that the excess, that is, the difference between what had been determined to be "reasonable" damages and what had actually been paid by Medi-Cal was an overcompensation to plaintiff. (Id. at p. 639.)
Hanif has been the subject of considerable analysis (see, e.g., Yanez, supra, 185 Cal.App.4th 1313), but the opinion seems to me to rest on the rather commonsense notion that a plaintiff in a tort action should not normally be compensated for loss or harm the plaintiff did not suffer. In that, I think Hanif is right.
If I understand the argument, plaintiff in this matter rests his claim for the amounts written off by the medical care providers in part on the "detriment" that I have referred to above, but in greater part on the thought that the written off amount is part of the benefit of his thrift, to use the phrase the court used in Helfend, when he purchased health insurance. That is, one of those benefits, according to plaintiff, is the ability of the insurance carrier to secure the write off to begin with. But I find that "benefit" equally illusory. The plaintiff does not care whether the insurance carrier pays 100 percent, 75 percent, or 35 percent of the amount billed so long as he does not have to pay anything beyond his insurance copay or deductible. That is the benefit he bought and the benefit he is entitled to.
As noted earlier, other jurisdictions have struggled with these questions. In Wills, supra, 892 N.E.2d 1018, the Illinois Supreme Court's survey of the case law noted that, at least as of 2008, most courts followed the "reasonable-value" approach to the question of compensable medical damages in tort actions. "Courts applying this approach hold that the plaintiff is entitled to recover the reasonable value of medical services and do not distinguish between whether a plaintiff has private insurance or is covered by a government program." (Id. at p. 1027.) Citing, among others, Hanif, the court also noted that a minority of these courts hold that the reasonable value of medical services is the amount actually paid. (Wills, at p. 1027.)
*335 While ultimately allowing for compensation for the reasonable value of medical services regardless of the amount actually paid has appeal, it seems to me that approach presents at least two difficulties. First, it compensates the plaintiff for detriment that the plaintiff, in fact, never suffered, although I recognize that in different contexts, such as one where there has been a gift of services, that might not be as troubling as it otherwise might be.
Second is the difficulty of determining the reasonable value of medical services to begin with.
"The complexities of health care pricing structures make it difficult to determine whether the amount paid, the amount billed, or an amount in between represents the reasonable value of medical services. One authority reports that hospitals historically billed insured and uninsured patients similarly. Mark A. Hall & Carl E. Schneider, Patients As Consumers: Courts, Contracts, and the New Medical Marketplace, 106 Mich. L. Rev. 643, 663 (2008). With the advent of managed care, some insurers began demanding deep discounts, and hospitals shifted costs to less influential patients. Id. This authority reports that insurers generally pay about forty cents per dollar of billed charges and that hospitals accept such amounts in full satisfaction of the billed charges. Id.
"As more medical providers are paid under fixed payment arrangements, another authority reports, hospital charge structures have become less correlated to hospital operations and actual payments. The Lewin Group, A Study of Hospital Charge Setting Practices i (2005). Currently, the relationship between charges and costs is `tenuous at best.' Id. at 7. In fact, hospital executives reportedly admit that most charges have `no relation to anything, and certainly not to cost.' Hall, Patients As Consumers at 665." (Stanley v. Walker, supra, 906 N.E.2d at p. 857.)
Given the above, the jury's task of deciding the reasonable cost of medical care is one not to be envied. While I recognize that, absent a stipulation, California juries are required to do that now, one might suspect that an abandonment of the Hanif rule may well result in a much more vigorous challenge to claimed medical costs that exceed the amounts actually paid. It seems to me we risk having lawyers litigate, and juries trying to decide, whether $10 is the reasonable cost of a box of hospital tissues or $3 is the reasonable cost for a bendable straw. Although I agree that a jury should hear relevant evidence of the cost of medical services, I would suggest that a determination of the reasonable cost of medical services ultimately should rest with the two parties with the most sophistication in the matter; the health care provider and the health care insurer.
*336 In any event, the $93,213.62 the court awards the plaintiff today can only be characterized, in my view, as phantom damages given substance by an overbroad application of the collateral source rule. I think it is an unwarranted extension of a much criticized concept. To award this amount as "damages" is to disregard the fundamental principle that tort damages are intended to compensate for loss or harm. There is none here.
I would affirm the judgment.
NOTES
[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II. and III.
[1] In fairness to the trial court, we note that, in reducing the award, it applied this court's decisions in Greer v. Buzgheia (2006) 141 Cal.App.4th 1150, 1157 [46 Cal.Rptr.3d 780] (Greer), and Hanif v. Housing Authority (1988) 200 Cal.App.3d 635, 640-644 [246 Cal.Rptr. 192] (Hanif).
[2] The reduced judgment was less than plaintiff's $298,000 offer under Code of Civil Procedure section 998.
[3] We granted the application of Consumer Attorneys of California to file a brief in support of plaintiff's position. Defendant has filed an answer brief responding to the amicus curiae brief of Consumer Attorneys of California.
[4] Thus, the collateral source rule may seem to operate on some occasions to supersede the general rule that "`[a] plaintiff in a tort action is not, in being awarded damages, to be placed in a better position than he would have been had the wrong not been done.' [Citation.]" (Metz v. Soares (2006) 142 Cal.App.4th 1250, 1255 [48 Cal.Rptr.3d 743]; see Safeco Ins. Co. v. J & D Painting (1993) 17 Cal.App.4th 1199, 1202 [21 Cal.Rptr.2d 903].)
[5] The referenced paragraphs (1) and (2) of subdivision (f) of section 985 provide express requirements applicable to the trial court's determination depending on whether the collateral source at issue is Medi-Cal (or another publicly funded source) or private insurance. The referenced paragraph (3) of subdivision (f) of section 985 directs the trial court to make a number of specific adjustments to any reimbursement or reduced award for a plaintiff's comparative fault, payment of premiums, and payment or debt for attorney fees, costs and reasonable expenses.
[6] For opposing views of Hanif/i>Nishihama see Olsen v. Reid (2008) 164 Cal.App.4th 200, 204 [79 Cal.Rptr.3d 255] (conc. opn. of Moore, J.), 214 (conc. opn. of Fybel, J.); see also Barer, The Collateral Conundrum: Olsen v. Reid Frames the Hanif/Nishihama Controversyand Suggests How It Will Turn Out (No. 3 2008) California State Bar Litigation Section's Journal, California Litigation, volume 21, at pages 5-11; Sumner, Medical Special Damages "Incurred" Under California Law: The Collateral Source Rule, Law of Contracts, and the Discount Myth (No. 3 2008) California State Bar Litigation Section's Journal, supra, at pages 12-18.
[*] See footnote, ante, page 313.